J. CHRISTOPHER JORGENSEN (State Bar No. 5382)
LEWIS AND ROCA LLP
3993 Howard Hughes Parkway, Suite 600
Las Vegas, Nevada  89169
(702) 474-2642; (702) 216-6178 (fax)
cjorgensen@lrlaw.com

MARC T.G. DWORSKY (*pro hac vice* forthcoming)
JAMES C. RUTTEN (*pro hac vice* forthcoming
ERIN J. COX (*pro hac vice* forthcoming)
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, 35th Floor
Los Angeles, California  90071-1560
(213) 683-9100; (213) 687-3702 (fax)
marc.dworsky@mto.com, james.rutten@mto.com,
erin.cox@mto.com

Attorneys for Defendant BANC OF AMERICA
SECURITIES LLC

[Additional parties and counsel appear on signature pages]

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA – SOUTHERN DIVISION

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION, as receiver for SECURITY SAVINGS BANK,<br><br>              Plaintiff,<br><br>    vs.<br><br>BANC OF AMERICA SECURITIES LLC, BARCLAYS CAPITAL INC., and MORGAN STANLEY & COMPANY LLC F/K/A MORGAN STANLEY & COMPANY, INC.,<br><br>              Defendants. | CASE NO.<br><br><br><br><br><br>**NOTICE OF REMOVAL** |

16918944.6

1   TO THE CLERK OF THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:

2           PLEASE TAKE NOTICE THAT Defendants Banc of America Securities LLC, Barclays

3   Capital Inc., and Morgan Stanley & Co. LLC hereby remove Case No. A-12-657025-B, filed in

4   the District Court of the State of Nevada, County of Clark, to the United States District Court for

5   the District of Nevada, Southern Division.  Defendants remove this action under 28 U.S.C.

6   §§ 1441 and 1452 on the following grounds:

7         (a)     The Court has original federal question jurisdiction under 28 U.S.C. § 1331

8                  because (i) Plaintiff is the Federal Deposit Insurance Corporation ("FDIC") in its

9                  capacity as receiver for Security Savings Bank ("Security Savings"), and 12

10                 U.S.C. § 1819(b)(2)(A) provides that all civil actions "to which the [FDIC], in any

11                 capacity, is a party shall be deemed to arise under the laws of the United States";

12                 (ii) the FDIC's statutory authorization to sue and be sued in federal court under 12

13                 U.S.C. § 1819(a) separately gives rise to federal question jurisdiction; and (iii) the

14                 FDIC is controlled by the federal government, which separately gives rise to

15                 federal question jurisdiction under the terms of 28 U.S.C. § 1349.

16        (b)     The Court has original bankruptcy "related to" jurisdiction under 28 U.S.C. § 1334

17                 because this action is related to numerous ongoing federal bankruptcy proceedings.

18  **I.**      **PROCEDURAL HISTORY AND BACKGROUND**

19        1.     On February 27, 2009, the Financial Institutions Division of the Nevada

20  Department of Business and Industry appointed the FDIC as receiver for Security Savings.  (*See*

21  Ex. C at 7.)  On February 24, 2012, the FDIC, in its capacity as receiver, commenced this action

22  by filing a Complaint in the District Court of the State of Nevada, County of Clark, styled

23  *Federal Deposit Insurance Corporation, as Receiver for Security Savings Bank v. Banc of*

24  *America Securities LLC, Barclays Capital Inc., and Morgan Stanley & Company LLC f/k/a*

25  *Morgan Stanley & Company, Inc.*, Case No. A-12-657025-B.  The FDIC's Complaint alleges

26  claims under the federal Securities Act of 1933 (the "1933 Act") and the Nevada Securities Act

27  arising from Security Savings' purchases of mortgage-backed pass-through certificates.  The

28  FDIC alleges that the certificates were issued by CWALT, Inc. (an affiliate of Countrywide

1   Home Loans, Inc.), offered for sale by Defendants in their capacity as underwriters for the

2   securities offerings, and purchased by Security Savings from certain Defendants.  CWALT, Inc.

3   and the various Countrywide entities are collectively referred to herein as "Countrywide."

4       2.      Defendants first received notice of this action and of its removability when they

5   were served with the Complaint on March 2, 2012, a true and correct copy of which is included in

6   Exhibit A.  Defendants' removal of this action is timely because this Notice of Removal is filed

7   within 30 days of that date.  *See* 28 U.S.C. § 1446(b).  All Defendants consent to removal subject

8   to and without waiving any defenses and rights available to them, including but not limited to any

9   personal jurisdiction defenses.

10       3.      All process, pleadings, and orders served upon Defendants in the state court action

11   are attached hereto as Exhibit B (other than the Complaint, which is attached as Exhibit A).

12   ## II.    THE COURT HAS FEDERAL QUESTION JURISDICTION

13       4.      Because the FDIC is the Plaintiff in this action, the Court has federal question

14   jurisdiction under 28 U.S.C. § 1331 for three separate and independently sufficient reasons.[1]

15       5.      First, 12 U.S.C. § 1819(b)(2)(A) provides that all civil actions "to which the

16   [FDIC], in any capacity, is a party shall be deemed to arise under the laws of the United States."

17   *See FDIC v. Cabral*, 989 F.2d 525, 526 (1st Cir. 1992) (explaining that under this statute, "other

18   parties [besides the FDIC] can remove lawsuits involving the FDIC to federal court. . . . [b]ecause

19   cases involving the FDIC as a party 'arise under' federal law") (emphasis removed).[2]

20       6.      Second, 12 U.S.C. § 1819(a) authorizes the FDIC "[t]o sue and be sued, and

21   complain and defend, . . . in any court of law or equity, State or Federal," and the United States

22   Supreme Court has held that this language separately "grant[s] original federal jurisdiction." *Am.*

23   *Nat'l Red Cross v. S.G. & A.E.*, 505 U.S. 247, 254-55 (1992) (quoting *D'Oench, Duhme & Co. v.*

24   *FDIC*, 315 U.S. 447, 455-56 (1942)).

25   _____

26   [1] The Court also would have had original federal question jurisdiction over this action had it been filed in federal court for the additional reason that the Complaint asserts claims under the federal 1933 Act.

27   [2] 12 U.S.C. § 1819(b)(2)(D), the limited exception to federal question jurisdiction over FDIC-

28   related actions, does not apply in this case because the FDIC is a plaintiff, among other reasons.

7.     Third, 28 U.S.C. § 1349 confers jurisdiction over "any civil action by or against any corporation . . . incorporated by or under any Act of Congress" if "the United States is the owner of more than one-half its capital stock." Section 1349 confers jurisdiction even where the government has no literal stock ownership in the entity in question, because the statute was meant "to preserve federal question jurisdiction over federally-chartered corporations in which the Government has the controlling interest," and the "use of the words . . . 'owner of more than one-half its capital stock' simply represents a short-hand expression for control." *Gov't Nat'l Mortg. Ass'n v. Terry*, 608 F.2d 614, 621 n.10 (5th Cir. 1979); *accord C.H. v. Am. Red Cross*, 684 F. Supp. 1018, 1022 (E.D. Mo. 1987) ("Section 1349 was intended to confer federal jurisdiction on suits involving all 'Government-controlled corporations,' and not only those corporations controlled by the government by virtue of majority stock ownership."). Section 1349 separately confers jurisdiction here because the FDIC was incorporated by an Act of Congress, namely, 12 U.S.C. § 1819, and is government-controlled.

8.     For these reasons, the Court has federal question jurisdiction under 28 U.S.C. § 1331, and removal is proper under 28 U.S.C. § 1441.

## III.     THE COURT HAS BANKRUPTCY "RELATED TO" JURISDICTION

9.     The Court also has bankruptcy "related to" jurisdiction under 28 U.S.C. § 1334(b), which confers original jurisdiction over "all civil proceedings arising under title 11 [of the United States Code], or arising in or related to cases under title 11."

10.     The FDIC's allegations relate to certificates backed in part by mortgage loans originated by entities that have filed, or whose corporate parents have filed, petitions for relief under Title 11 (collectively, the "Bankrupt Originators"), including but not limited to the following:

        (a)     Aegis Mortgage Corporation, which on August 13, 2007 filed a voluntary petition for relief under Title 11 in the United States Bankruptcy Court for the District of Delaware, *In re Aegis Mortgage Corp.*, Case No. 07-11119 (BLS);

1      (b)    Alliance Bancorp, which on July 13, 2007 filed a voluntary petition for

2      relief under Title 11 in the United States Bankruptcy Court for the District

3      of Delaware, *In re Alliance Bancorp*, Case No. 07-10942 (CSS);

4      (c)    Alliance Bancorp Inc. (f/k/a United Financial Mortgage Corporation),

5      which on July 13, 2007 filed a voluntary petition for relief under Title 11 in

6      the United States Bankruptcy Court for the District of Delaware, *In re*

7      *Alliance Bancorp Inc.*, Case No. 07-10943 (CSS);

8      (d)    American Home Mortgage Investment Corporation, which on August 6,

9      2007 filed a voluntary petition for relief under Title 11 in the United States

10      Bankruptcy Court for the District of Delaware, *In re American Home*

11      *Mortgage Investment Corp.*, Case No. 07-11048 (CSS);

12      (e)    American Home Mortgage Investment Corporation's parent, American

13      Home Mortgage Holdings, Inc., which on August 6, 2007 filed a voluntary

14      petition for relief under Title 11 in the United States Bankruptcy Court for

15      the District of Delaware, *In re American Home Mortgage Holdings, Inc.*,

16      Case No. 07-11047 (CSS);

17      (f)    Cal Coast Mortgage Corporation, which on October 5, 2006 filed a

18      voluntary petition for relief under Title 11 in the United States Bankruptcy

19      Court for the Southern District of California, *In re Cal Coast Mortgage*

20      *Corp.*, Case No. 06-02981 (LST);

21      (g)    ComUnity Lending, Inc., which on January 4, 2008 filed a voluntary

22      petition for relief under Title 11 in the United States Bankruptcy Court for

23      the Northern District of California, *In re ComUnity Lending, Inc.*, Case No.

24      08-50030 (CN);

25      (h)    Fieldstone Mortgage Company, which on November 23, 2007 filed a

26      voluntary petition for relief under Title 11 in the United States Bankruptcy

27      Court for the District of Maryland, *In re Fieldstone Mortgage Company*,

28      Case No. 07-21814-JS;

1        (i)    First Magnus Financial Corporation, which on August 21, 2007 filed a

2             voluntary petition for relief under Title 11 in the United States Bankruptcy

3             Court for the District of Arizona, *In re First Magnus Financial Corp.*, Case

4             No. 4:07-01578 (JMM);

5        (j)    First NLC Financial Services LLC, which on January 18, 2008 filed a

6             voluntary petition for relief under Title 11 in the United States Bankruptcy

7             Court for the Southern District of Florida, *In re First NLC Financial*

8             *Services, LLC*, Case No. 08-10632 (PGH);

9        (k)    Home Savings Mortgage, which on September 5, 2007 filed a voluntary

10           petition for relief under Title 11 in the United States Bankruptcy Court for

11           the Central District of California, *In re Home Savings Mortgage,* Case No.

12           07-13259 (GM);

13        (*l*)    New Century TRS Holdings, Inc. and its affiliates, which on April 2, 2007

14           filed voluntary petitions for relief under Title 11 in the United States

15           Bankruptcy Court for the District of Delaware, *In re New Century TRS*

16           *Holdings, Inc. et al.*, Lead Case No. 07-10416 (KJC);

17        (m)    Oak Street Mortgage LLC, which on June 8, 2007 filed a voluntary petition

18           for relief under Title 11 in the United States Bankruptcy Court for the

19           Southern District of Indiana, *In re Oak Street Mortgage LLC*, Case No. 07-

20           05279 (JKC); and

21        (n)    Prime Mortgage Financial, Inc., which on January 29, 2008 filed a

22           voluntary petition for relief under Title 11 in the United States Bankruptcy

23           Court for the District of Massachusetts, *In re Prime Mortgage Financial,*

24           *Inc.,* Case No. 08-40238 (MSH).

25        11.    The FDIC alleges that the offering documents for the certificates purchased by

26  Security Savings contained misstatements regarding the characteristics of the mortgage loans

27  backing the certificates "and the extent to which the entities that made the loans disregarded their

28  own [underwriting] standards in doing so." (Compl. ¶ 1.) According to the FDIC's Complaint,

16918944.6               - 5 -

1   statements in the offering documents concerning underwriting standards were untrue or

2   misleading because, among other things, "the originators were disregarding those underwriting

3   standards," "the originators were making extensive exceptions to those underwriting standards,"

4   and "the originators were making mortgage loans that borrowers could not repay." (*Id.* ¶ 77.)

5        12.   The originators of the loans include the Bankrupt Originators, which sold the loans

6   to Countrywide pursuant to loan purchase agreements, an example of which is attached as Exhibit

7   D. The Bankrupt Originators agreed in the loan purchase agreements to provide indemnification

8   for defense costs and any judgment or other amount paid in resolution of claims based on their

9   mortgage origination practices. (*See, e.g.,* Ex. D at § 9.) To the extent the loans were transferred

10  among different Countrywide entities, corresponding indemnities were provided. Countrywide

11  agreed to indemnify Defendants for such claims in connection with Defendants' sales of the

12  certificates as underwriters to investors like Security Savings. (*See, e.g.*, Ex. E at § 3.1.)

13  Defendants' indemnification rights against Countrywide are mirrored by Countrywide's

14  indemnification rights against the Bankrupt Originators.

15       13.   Countrywide has filed proofs of claim in the bankruptcy proceedings of each of the

16  Bankrupt Originators identified above.

17       14.   An action is "related to" a bankruptcy proceeding if it "could conceivably have

18  any effect" on the administration of the bankrupt estate, such that its "outcome could alter

19  debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and

20  which in any way impacts upon the handling and administration of the bankrupt estate." *In re*

21  *Pegasus Gold Corp.*, 394 F.3d 1189, 1193 (9th Cir. 2005) (quoting *In re Fietz,* 852 F.2d 455, 457

22  (9th Cir. 1988)). This action relates to the Bankrupt Originators' bankruptcy proceedings

23  described above because, by virtue of the indemnity obligations owed in succession to

24  Defendants by Countrywide, and to Countrywide by the Bankrupt Originators, any costs and

25  expenses incurred by any of the Defendants to defend this action and any judgment against any of

26  the Defendants could affect the property of the Bankrupt Originators and/or any confirmed

27  bankruptcy plan. *See, e.g., Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC,* 594 F.3d 383,

28  385-87 (5th Cir. 2010) (holding that "related to" jurisdiction existed where a third-party debtor

1   agreed to indemnify a mortgage-backed security seller "in a variety of circumstances, including

2   any breach of a representation about the mortgages . . . and any claims made against [the seller]

3   by third parties"); *Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*, 447 B.R. 302, 309-10

4   (C.D. Cal. 2010) (holding that an indemnity obligation of the type at issue here gives rise to

5   "related to" jurisdiction).[3]

6          15.     Further, numerous equitable considerations support exercising "related to"

7   jurisdiction over this action, including but not limited to:

8          (a)     This is a federal case at its core because it is brought by a federal entity and

9                  involves claims under the federal 1933 Act.  This case therefore will

10                 require interpretation and application of federal law.

11         (b)     Numerous substantially identical cases involving Countrywide mortgage-

12                 backed securities already are pending in federal court, including cases that

13                 have been transferred to a multidistrict litigation proceeding pending in the

14                 United States District Court for the Central District of California that was

15                 established on August 15, 2011 by the Judicial Panel on Multidistrict

16                 Litigation ("JPML") for cases – such as this one – that concern

17                 Countrywide mortgage-backed securities.  The JPML centralized such

18                 cases for consolidated or coordinated pre-trial proceedings before the

19                 Honorable Mariana Pfaelzer.  *See In re Countrywide Mortg. Backed Sec.*

20                 *Litig.*, MDL No. 2265 (the "Countrywide MDL").[4]  There are currently 21

21                 cases (both putative class actions and individual actions, including a case

22                 brought by the FDIC) that have been transferred to the Countrywide MDL,

23                 as well as one additional case (also brought by the FDIC) subject to an

24   _____

25   [3] Assuming *arguendo* that it were necessary for Defendants to show a "close nexus" to a federal
     bankruptcy proceeding, this case still would be related to the proceedings discussed above
26   because the indemnity claims against the Bankrupt Originators directly affect the administration
     of the bankruptcy proceedings and the amounts available for distribution to creditors.  *See, e.g.,*
27   *Stichting*, 447 B.R. at 310-11; *Allstate Ins. Co. v. ACE Sec. Corp.*, 2011 U.S. Dist. LEXIS 91989,
     at *14-15 (S.D.N.Y. Aug 17, 2011).

28   [4] A copy of the JPML's order forming the Countrywide MDL is attached as Exhibit F.

order issued by the JPML conditionally transferring it to the Countrywide MDL.  In the present case now being removed, Defendants intend to file a notice of related action with the JPML pursuant to Rule 7.1(a) of the Rules of Procedure of the JPML, notifying the JPML of this potential "tag-along action" for the purpose of transfer to the Countrywide MDL.  There would be great efficiency in coordinating this case with the substantially similar Countrywide mortgage-backed securities cases already pending in the Countrywide MDL, which weighs heavily in favor of exercising "related to" jurisdiction.  *See Stichting*, 447 B.R. at 308-12 (Pfaelzer, J.) ("Most significantly, this is a federal securities action at its core; a nearly identical action is already proceeding here in this Court.  The issues in this lawsuit are complex and in some respects novel, but they involve the application of federal law.  This Court is intimately familiar with these issues because its docket includes a nearly identical case.  Both cases include allegations of violations of Sections 11, 12 and 15 of the federal Securities Act of 1933 . . . . Thus, this Court is better suited to resolve these issues than the Los Angeles County Superior Court.") (citation omitted).

(c)   There are numerous bases for federal question jurisdiction over this action, as set forth above.

(d)   In addition, complete diversity of citizenship exists and would permit removal on diversity grounds but for the anti-removal provision contained in § 22(a) of the 1933 Act.  The FDIC is a citizen of Nevada for purposes of this action, because it is acting in its capacity as receiver for Security Savings, and "as receiver, the FDIC is considered to have the citizenship of the bank[] in receivership." *FDIC v. Lindquist & Vennum*, 702 F. Supp. 749, 750-51 (D. Minn. 1989) (agreeing with the FDIC's position that "federal diversity jurisdiction exists because the citizenship of each of the banks [in receivership] and defendant is diverse").  Defendants variously

16918944.6

- 8 -

1     are citizens of Delaware, Connecticut, North Carolina, and New York.

2     Because complete diversity exists and the amount in controversy exceeds

3     $75,000, all the policy reasons underlying Congress' creation of diversity

4     jurisdiction apply here, further demonstrating that the equities support

5     exercising "related to" jurisdiction.

6     16.     This is not a bankruptcy core proceeding under 28 U.S.C. § 157(b) or Federal Rule

7 of Bankruptcy Procedure 9027(a)(1), and Defendants do not consent to entry of final orders or

8 judgment by any bankruptcy judge.

9     17.     For the foregoing reasons, the Court has original bankruptcy "related to"

10 jurisdiction under 28 U.S.C. § 1334, and removal is proper under 28 U.S.C. § 1452.

11 **IV.     SECTION 22(A) OF THE 1933 ACT DOES NOT BAR REMOVAL**

12     18.     Section 22(a) of the 1933 Act, 15 U.S.C. § 77v(a), does not preclude or limit

13 removal, and does not require a complete or partial remand.

14     19.     Under 28 U.S.C. § 1441(c), if an action includes both a claim that gives rise to

15 federal question jurisdiction and "a claim that has been made nonremovable by statute, the entire

16 action may be removed if the action would be removable without the inclusion of the [otherwise

17 non-removable] claim." *See Taylor v. City of Bristol*, 2012 WL 748625, at *1 (W.D. Va. Mar. 8,

18 2012) ("The removal power covers the entire action in which a federal claim is raised[,] . . . even

19 where it includes an otherwise nonremovable claim."). Under § 1441(c), therefore, § 22(a) of the

20 1933 Act does not preclude removal of this action. Although § 1441(c) goes on to provide that

21 the claims made non-removable by statute may be remanded, it neither requires nor permits such

22 a partial remand here, because § 22(a) does not apply when removal is based in whole or in part

23 on bankruptcy "related to" grounds. *See Cal. Pub. Employees' Ret. Sys. v. Worldcom, Inc.,* 368

24 F.3d 86, 108 (2d Cir. 2004) ("[G]enerally nonremovable claims brought under the Securities Act

25 of 1933 may be removed to federal court if they come within the purview of 28 U.S.C. § 1452(a),

26 which confers federal jurisdiction over claims that are related to a bankruptcy case."); *Fed. Home*

27 *Loan Bank v. Deutsche Bank Sec., Inc.*, 2010 WL 5394742, at *5-6 (N.D. Cal. Dec. 20, 2010)

28 (holding that "section 22(a) does not trump the Court's related-to bankruptcy jurisdiction,"

1    because "Congress crafted section 1452(a) to permit removal of matters related to bankruptcy

2    proceedings, and the Court will not construe section 22(a) in a way that would unduly interfere

3    with its operation").

4         20.    For these reasons, § 22(a) does not preclude or limit removal, and does not require

5    or permit a complete or partial remand.

6    **V.    CONCLUSION**

7         21.    Based on the foregoing, Defendants hereby remove this action to the United States

8    District Court for the District of Nevada, Southern Division.  Defendants reserve the right to

9    submit additional evidence and argument as needed to supplement this "short and plain statement

10   of the grounds for removal."  28 U.S.C. 1446(a).

11   DATED: March 30, 2012               LEWIS AND ROCA LLP
                                         MUNGER, TOLLES & OLSON LLP
12

13                                       _/s/ J. Christopher Jorgensen_
14                                           J. Christopher Jorgensen

15                                       Attorneys for Defendant BANC OF
                                         AMERICA SECURITIES LLC
16
     DATED: March 30, 2012               SANTORO WHITMIRE
17                                       SULLIVAN & CROMWELL LLP

18
                                         _/s/ Nicholas J. Santoro_
19                                           Nicholas J. Santoro

20                                       Attorneys for Defendant BARCLAYS
                                         CAPITAL INC.
21
     DATED: March 30, 2012               GREENBERG TRAURIG LLP
22                                       DAVIS POLK & WARDWELL LLP

23

24                                       _/s/ Mark E. Ferrario_
                                             Mark E. Ferrario
25

26                                       Attorneys for Defendant MORGAN
                                         STANLEY & CO. LLC

27

28

16918944.6                         - 10 -

1

CERTIFICATE OF SERVICE

2

    The undersigned certifies that a copy of the foregoing document was served on the

3

following counsel, via US mail, postage prepaid, on the 30th day of March, 2012:

4

Robert McCoy, Esq./electronically served    David J. Grais, Esq.

5

Joni A. Jamison, Esq.    Mark B. Holton, Esq.
Morris Law Group    Leanne M. Wilson, Esq.

6

900 Bank of America Plaza    Grais & Ellsworth LLP
300 South Fourth Street    40 East 52nd Street

7

Las Vegas, NV  89101    New York, New York  10022
Attorneys for Plaintiff    Attorneys for Plaintiff

8

9

*/s/ Sue Silcott*
an employee of Lewis and Roca LLP

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

16918944.6

- 11 -

# EXHIBIT A

BUSINESS COURT CIVIL COVER SHEET A - 1 2 - 6 5 7 0 2 5 - B

XXI X

Clark County, Nevada

Case No. _____
*(Assigned by Clerk's Office)*

## I. Party Information

Plaintiff(s) (name/address/phone): FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER FOR SECURITY SAVINGS BANK,,

Defendant(s) (name/address/phone): BANC OF AMERICA SECURITIES LLC; BARCLAYS CAPITAL INC.; and MORGAN STANLEY & COMPANY LLC f/k/a MORGAN STANLEY & COMPANY, INC.,

Attorney (name/address/phone):
Robert McCoy. No. 9121; Joni Jamison, No. 11614; 300 S. 4th St., Suite 900, Las Vegas, NV 89101/(702)474-9400

Attorney (name/address/phone):

## II. Nature of Controversy

☐ Arbitration Requested

Please check the applicable boxes for both the civil case type and business court case type.

| Civil Cases | | Business Court |
|---|---|---|
| **Real Property** / **Other Civil Types** | | **Business Court Case Type** |

**Real Property**

☐ Landlord/Tenant
  ☐ Unlawful Detainer
☐ Title to Property
  ☐ Foreclosure
  ☐ Liens
  ☐ Quiet Title
  ☐ Specific Performance
☐ Other Real Property
  ☐ Partition
  ☐ Planning/Zoning

**Other Civil Types**

☐ Civil Writ
  ☐ Other Special Proceeding
☐ Other Civil Filing
  ☐ Compromise of Minor's Claim
  ☐ Conversion of Property
  ☐ Damage to Property
  ☐ Employment Security
  ☐ Enforcement of Judgment
  ☐ Foreign Judgment – Civil
  ☐ Other Personal Property
  ☐ Recovery of Property
  ☐ Stockholder Suit
  ☐ Other Civil Matters

**Business Court Case Type**

Clark County Business Court
☐ NRS Chapters 78-89
☐ Commodities (NRS 91)
☑ Securities (NRS 90)
☐ Mergers (NRS 92A)
☐ Uniform Commercial Code (NRS 104)
☐ Purchase or Sale of Stock /Assets of Business/ Corporate Real Estate
☐ Trade-mark/Trade Name (NRS 600)
☐ Enhanced Case Mgmt/Business
☐ Other Business Court Matters

**Negligence Torts**

☐ Negligence – Premises Liability
  (Slip/Fall)
☐ Negligence – Other

☐ Construction Defect
  ☐ Chapter 40
  ☐ General
☐ Breach of Contract
  ☐ Building & Construction
  ☐ Insurance Carrier
  ☐ Commercial Instrument

Washoe County Business Court
☐ NRS Chapters 78-88
☐ Commodities (NRS 91)
☐ Securities (NRS 90)
☐ Investments (NRS 104 Art. 8)
☐ Deceptive Trade Practices (NRS 598)

**Torts**

☐ Product Liability
  ☐ Motor Vehicle-Product Liability
  ☐ Other Torts-Product Liability
☐ Intentional Misconduct
  ☐ Defamation (Libel/Slander)
  ☐ Interfere with Contract Rights
☐ Employment Torts (Wrongful Termination)
☐ Other Torts
  ☐ Anti-trust
  ☐ Fraud/Misrepresentation
  ☐ Insurance
  ☐ Legal Tort
  ☐ Unfair Competition

  ☐ Other Contracts/Acct/Judgment
  ☐ Collection of Actions
  ☐ Employment Contract
  ☐ Guarantee
  ☐ Sale Contract
  ☐ Uniform Commercial Code
☐ Civil Petition for Judicial Review
  ☐ Foreclosure Mediation
  ☐ Other Administrative Law
  ☐ Department of Motor Vehicles
  ☐ Worker's Compensation Appeal

☐ Trade-mark/Trade Name (NRS 600)
☐ Trade Secrets (NRS 600A)
☐ Enhanced Case Mgmt/Business
☐ Other Business Court Matters

---

02/24/12
Date

*Joni Jamison* (signature)
Signature of initiating party or representative

Nevada AOC – Research and Statistics Unit
Pursuant to N.R.S. 1.360 and 3.275

Form PA 201-BC
Rev. 1.0
6/2010

# CIVIL COVER SHEET

County, Nevada

Case No. _____
*(Assigned by Clerk's Office)*

## I. Party Information

| | | | |
|---|---|---|---|
| Plaintiff(s) (name/address/phone): | FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER FOR SECURITY SAVINGS BANK; Robert McCoy, No. 9121; Joni Jamison, No. 11614; 300 S⊞ | Defendant(s) (name/address/phone): | BANC OF AMERICA SECURITIES LLC; BARCLAYS CAPITAL INC.; and MORGAN STANLEY & COMPANY LLC f/k/a MORGAN STANLEY & COMPANY, INC., |
| Attorney (name/address/phone): | | Attorney (name/address/phone): | |

## II. Nature of Controversy (Please check applicable bold category and applicable subcategory, if appropriate)

☐ **Arbitration Requested**

### Civil Cases

| Real Property | Torts | |
|---|---|---|

**Real Property**

☐ **Landlord/Tenant**
  ☐ Unlawful Detainer
☐ **Title to Property**
  ☐ Foreclosure
  ☐ Liens
  ☐ Quiet Title
  ☐ Specific Performance
☐ **Condemnation/Eminent Domain**
☐ **Other Real Property**
  ☐ Partition
  ☐ Planning/Zoning

**Torts**

**Negligence**
☐ Negligence – Auto
☐ Negligence – Medical/Dental
☐ Negligence – Premises Liability
  (Slip/Fall)
☐ Negligence – Other

☐ **Product Liability**
  ☐ Product Liability/Motor Vehicle
  ☐ Other Torts/Product Liability
☐ **Intentional Misconduct**
  ☐ Torts/Defamation (Libel/Slander)
  ☐ Interfere with Contract Rights
☐ **Employment Torts** (Wrongful termination)
☐ **Other Torts**
  ☐ Anti-trust
  ☐ Fraud/Misrepresentation
  ☐ Insurance
  ☐ Legal Tort
  ☐ Unfair Competition

| Probate | Other Civil Filing Types | |
|---|---|---|

**Probate**

Estimated Estate Value: _____

☐ **Summary Administration**
☐ **General Administration**
☐ **Special Administration**
☐ **Set Aside Estates**
☐ **Trust/Conservatorships**
  ☐ Individual Trustee
  ☐ Corporate Trustee
☐ **Other Probate**

**Other Civil Filing Types**

☐ **Construction Defect**
  ☐ Chapter 40
  ☐ General
☐ **Breach of Contract**
  ☐ Building & Construction
  ☐ Insurance Carrier
  ☐ Commercial Instrument
  ☐ Other Contracts/Acct/Judgment
  ☐ Collection of Actions
  ☐ Employment Contract
  ☐ Guarantee
  ☐ Sale Contract
  ☐ Uniform Commercial Code
☐ **Civil Petition for Judicial Review**
  ☐ Foreclosure Mediation
  ☐ Other Administrative Law
  ☐ Department of Motor Vehicles
  ☐ Worker's Compensation Appeal

☐ **Appeal from Lower Court** (*also check applicable civil case box*)
  ☐ Transfer from Justice Court
  ☐ Justice Court Civil Appeal
☐ **Civil Writ**
  ☐ Other Special Proceeding
☐ **Other Civil Filing**
  ☐ Compromise of Minor's Claim
  ☐ Conversion of Property
  ☐ Damage to Property
  ☐ Employment Security
  ☐ Enforcement of Judgment
  ☐ Foreign Judgment – Civil
  ☐ Other Personal Property
  ☐ Recovery of Property
  ☐ Stockholder Suit
  ☐ Other Civil Matters

## III. Business Court Requested (Please check applicable category; *for Clark or Washoe Counties only.*)

☐ NRS Chapters 78-88
☐ Commodities (NRS 90)
☑ Securities (NRS 90)

☐ Investments (NRS 104 Art. 8)
☐ Deceptive Trade Practices (NRS 598)
☐ Trademarks (NRS 600A)

☐ Enhanced Case Mgmt/Business
☐ Other Business Court Matters

02/24/12
_____
Date

*Joni Jamison*
_____
Signature of initiating party or representative

***See other side for family-related case filings.***

Form PA 201
Rev. 2.5E

Electronically Filed
02/24/2012 04:23:16 PM

CLERK OF THE COURT

**COMPB**
**MORRIS PETERSON**
Robert McCoy, No. 9121
Email: rrm@morrislawgroup.com
Joni A. Jamison, No. 11614
Email: jaj@morrislawgroup.com
900 Bank of America Plaza
300 South Fourth Street
Las Vegas, Nevada 89101
Telephone: (702) 474-9400
Facsimile: (702) 474-9422

David J. Grais (*pro hac vice* to be submitted)
Email: dgrais@graisellsworth.com
Mark B. Holton (*pro hac vice* to be submitted)
Email: mholton@graisellsworth.com
Leanne M. Wilson (*pro hac vice* to be submitted)
Email: lwilson@graisellsworth.com
Grais & Ellsworth LLP
40 East 52nd Street
New York, New York 10022
Telephone: (212) 755-0100
Facsimile: (212) 755-0052

Attorneys for Plaintiff Federal Deposit
Insurance Corporation, as Receiver for
Security Savings Bank

DISTRICT COURT

CLARK COUNTY, NEVADA

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER FOR SECURITY SAVINGS BANK, <br><br> Plaintiff, <br><br> v. <br><br> BANC OF AMERICA SECURITIES LLC; BARCLAYS CAPITAL INC.; and MORGAN STANLEY & COMPANY LLC f/k/a MORGAN STANLEY & COMPANY, INC., <br><br> Defendants. | Case No. A-12-657025-B <br> Dept. No XXI X <br><br> **COMPLAINT** <br><br> **[BUSINESS COURT REQUESTED]** |

MORRIS PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

1    Plaintiff Federal Deposit Insurance Corporation, as Receiver for

2  Security Savings Bank, for its Complaint against Banc of America Securities LLC,

3  Barclays Capital Inc., and Morgan Stanley & Company LLC, alleges as follows:

4                    I. NATURE OF THIS ACTION

5         1.    This is an action for damages caused by violation of the Nevada

6  Securities Act (**NSA**) and the federal Securities Act of 1933 (**1933 Act**) by the

7  defendants.  As alleged in detail below, defendants issued, underwrote, and sold

8  to Security Savings Bank (referred to in this Complaint as **SSB**) five securities

9  known as "certificates," which were backed by collateral pools of residential

10  mortgage loans.  SSB paid approximately $9.5 million for all of the certificates.

11  When they issued, underwrote, or sold these certificates to SSB, the defendants

12  made numerous statements of material facts about the certificates and, in

13  particular, about the credit quality of the mortgage loans that backed them.  Many

14  of those statements were untrue.  Moreover, the defendants omitted to state many

15  material facts that were necessary in order to make their statements not

16  misleading.  For example, the defendants made untrue statements or omitted

17  important information about such material facts as the loan-to-value ratios of the

18  mortgage loans, the extent to which appraisals of the properties that secured the

19  loans were performed in compliance with professional appraisal standards, the

20  number of borrowers who did not live in the houses that secured their loans (that

21  is, the number of properties that were not primary residences), and the extent to

22  which the entities that made the loans disregarded their own standards in doing

23  so.

24

25

26

27

28

MORRIS PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

2.     Based on an analysis of a random sample of loans in each of the five securitizations, the defendants made such untrue or misleading statements or omissions about at least the following numbers of the loans.[1]

| Securitization No. | Number of Loans about which Defendants made Material Untrue or Misleading Statements[2] | Number of Loans in the Securitization | Percentage of Loans about which Defendants Made Material Untrue or Misleading Statements |
|---|---|---|---|
| 1 | 782 | 1,083 | 72% |
| 2 | 1,225 | 1,884 | 65% |
| 3 | 1,754 | 2,551 | 69% |
| 4 | 400 | 572 | 70% |
| 5 | 1,295 | 2,131 | 60.8% |

3.     The certificates are "securities" within the meaning of the NSA and the 1933 Act.  The defendants are liable under the following provisions of the NSA and the 1933 Act:

*As underwriters*: Banc of America Securities LLC underwrote three of the certificates that SSB purchased.  Morgan Stanley underwrote two of the certificates that SSB purchased.  Barclays Capital Inc. underwrote one of the

---

[1] Plaintiff has no information that any of these loans was secured by a property located outside the United States. If there are such loans, Plaintiff makes no allegations, and will offer no evidence, about any loans in the securitizations that were secured by properties in a foreign country or in a dependency or insular possession of the United States.

[2] The method of random sampling that Plaintiff used ensures that conclusions about the entire collateral pool have a margin of error of no more than plus or minus 5% at a confidence level of 95% (that is, one can be 95% certain that the true percentage in the collateral pool as a whole is within 5% of the percentage measured in the sample).  For example, one can be 95% certain that the number of loans in Securitization No. 1 about which defendants made untrue or misleading statements or omissions is within 5% of 782, that is, between 704 and 860.  The same margin of error should be applied to all information in the Complaint and accompanying schedules that is based on a random sample of loans in a collateral pool.

MORRIS PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

Page 3 of 39

certificates that SSB purchased. These defendants are liable as "underwriters" under Section 11 of the 1933 Act.

*As sellers*: Banc of America Securities LLC sold SSB two of the certificates at the time they were issued. Banc of America Securities LLC is liable as a "seller" of the securities under Section 90.570 of the NSA and under Section 12(a)(2) of the 1933 Act. Barclays was an underwriter of one of those securities. Barclays is liable under Section 90.570 of the NSA as a "statutory seller" of the security that it underwrote, and which was sold to SSB.

## II. PARTIES

4. Plaintiff is the receiver for SSB. Under the Federal Deposit Insurance Act, the Federal Deposit Insurance Corporation, a corporation organized and existing under the laws of the United States of America, is authorized to be appointed as receiver for failed insured depository institutions. Under the Federal Deposit Insurance Act, Plaintiff is empowered to sue and complain in any court of law and to do so to pursue claims held by banks of which it is the receiver. 12 U.S.C. § 1819. Thus, Plaintiff has authority to pursue claims held by SSB, including its claims made against the defendants in this action.

5. Defendant Banc of America Securities LLC (referred to as **Banc of America Securities**) is a limited liability company organized under the laws of Delaware. Banc of America Securities was the underwriter of three of the certificates and sold two of the certificates to SSB at the time they were issued.

6. Defendant Barclays Capital Inc. (referred to as **Barclays**) is a corporation organized under the laws of Delaware. Barclays was an underwriter of one of the certificates.

7. Defendant Morgan Stanley & Company LLC (referred to as **Morgan Stanley**) is a limited liability company organized under the laws of Delaware. Morgan Stanley was formerly known as Morgan Stanley & Co. Inc. Morgan Stanley was the underwriter of two of the certificates.

MORRIS PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

### III. JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction pursuant to the Nevada Constitution and NRS 3.220.

9.     The Court has personal jurisdiction over the defendants pursuant to NRS 14.065.

10.    Venue is proper in this Court, pursuant to NRS 13.040, because none of the defendants are residents of Nevada.

### IV. SECURITIZATION OF MORTGAGE LOANS

11.    The securities that SSB purchased are so-called **residential mortgage-backed securities,** or **RMBS,** created in a process known as **securitization.** Securitization begins with loans on which the borrowers are to make payments, usually monthly. The entity that makes the loans is known as the **originator** of the loans. The process by which the originator decides whether to make particular loans is known as the **underwriting** of loans. The purpose of underwriting is to ensure that loans are made only to borrowers of sufficient credit standing to repay them and only against sufficient collateral. In the loan underwriting process, the originator applies its **underwriting standards.**

12.    In general, residential mortgage lenders may hold some of the mortgage loans they originate in their own portfolios and may sell other mortgage loans they originate into securitizations.

13.    In a securitization, a large number of loans, usually of a similar type, are grouped into a **collateral pool.** The originator of those loans sells them (and, with them, the right to receive the cash flow from them) to a **trust.** The trust pays the originator cash for the loans. The trust raises the cash to pay for the loans by selling **securities,** usually called **certificates,** to investors such as SSB. Each certificate entitles its holder to an agreed part of the cash flow from the loans in the collateral pool.

MORRIS PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

Page 5 of 39

14.    In a simple securitization, the holder of each certificate is entitled to a *pro rata* part of the overall monthly cash flow from the loans in the collateral pool.

15.    In a more complex securitization, the cash flow is divided into different parts, usually called **tranches** ("tranche" is "slice" in French), and the certificates are divided into different **classes**, each with different rights.  Each class of certificates is entitled to the cash flow in the tranche corresponding to that class.

16.    One way in which the cash flow is divided - and the rights of different classes of certificates distinguished - is by priority of payment or, put differently, risk of nonpayment.  The most senior class of certificates usually is entitled to be paid in full before the next most **senior** class, and so on.  Conversely, losses from defaults in payment of the loans in the collateral pool are allocated first to the most **subordinate** class of certificates, then to the class above that, and so on.  The interest rate on each class of certificates is usually proportional to the amount of risk that that class bears; the most senior certificates bear the least risk and thus pay the lowest rate of interest, the most subordinate, the opposite.  This hierarchy of rights to payment is referred to as the **waterfall**.

17.    The risk of a particular class of certificate is a function of both the riskiness of the loans in the collateral pool and the seniority of that class in the waterfall.  Even if the underlying loans are quite risky, the certificates may bear so little of that risk that they may be rated as **investment grade** (that is, BBB or above).  For example, assume a securitization of $100 million of risky loans, on which the historical loss rate is 5%.  Assume that there are two classes of certificates, a senior class of $50 million and a subordinate class of $50 million.  Even though the underlying loans are quite risky, the senior class of certificates would be paid in full as long as the $100 million of loans produced payments of at least $50 million plus interest, that is, unless the loss rate on those loans exceeded 50%, fully ten times the historical average.

MORRIS PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

18.     All of the certificates referred to in this Complaint were investment grade certificates that were rated at least BBB when SSB purchased them.

19.     Each securitization has a **sponsor**, the prime mover of the securitization.  Sometimes the sponsor is the originator or an affiliate.  In originator-sponsored securitizations, the collateral pool usually contains loans made by the originator that is sponsoring the securitization.  Other times, the sponsor may be an investment bank, which purchases loans from one or more originators, aggregates them into a collateral pool, sells them to a trust, and securitizes them.  The sponsor arranges for title to the loans to be transferred to an entity known as the **depositor**, which then transfers title to the loans to the trust.

20.     The obligor of the certificates in a securitization is the trust that purchases the loans in the collateral pool.  Because a trust has few assets other than the loans that it purchased, it may not be able to satisfy the liabilities of an **issuer** of securities (the certificates).  The law therefore treats the depositor as the issuer of a residential mortgage-backed certificate.

21.     **Securities underwriters**, like Banc of America Securities, Barclays, and Morgan Stanley, play a critical role in the process of securitization.  They underwrite the sale of the certificates, that is, they purchase the certificates from the trust and then sell them to investors.  Equally important, securities underwriters provide to potential investors the information that they need to decide whether to purchase certificates.

22.     Because the cash flow from the loans in the collateral pool of a securitization is the source of funds to pay the holders of the certificates issued by the trust, the credit quality of those certificates is dependent upon the credit quality of the loans in the collateral pool (and upon the place of each certificate in the waterfall).  The most important information about the credit quality of those loans is contained in the files that the originator develops while making the loans,

MORRIS PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

the so-called "loan files." For residential mortgage loans, each loan file normally contains comprehensive information from such important documents as the borrower's application for the loan, credit reports on the borrower, and an appraisal of the property that will secure the loan. The loan file may also include notes from the person who underwrote the loan about whether and how the loan complied with the originator's underwriting standards, including documentation of any "compensating factors" that justified any departure from those standards.

23.     Potential investors in certificates are not given access to loan files. Instead, the securities underwriters are responsible for gathering, verifying, and presenting to potential investors the information about the credit quality of the loans that will be deposited into the trust. They do so by using information about the loans that has been compiled into a database known as a **loan tape**. The securities underwriters use the loan tape to compile numerous statistics about the loans, which are presented to potential investors in a **prospectus supplement**, a disclosure document that the underwriters are required to file with the Securities and Exchange Commission. (SSB did not have access to the loan tape before it purchased the certificates, but Plaintiff has reviewed data from the loan tape in preparing this Complaint.)

24.     As alleged in detail below, the information in the prospectus supplements and other offering documents about the credit quality of the loans in the collateral pools of the trusts contained many statements that were material to the credit quality of those loans, but were untrue or misleading.

## V. THE SALES OF THE CERTIFICATES

25.     SSB purchased certificates in five securitizations (referred to in this Complaint as Securitizations Nos. 1 through 5). Details of each trust and each certificate are stated in Item 25 of Schedules 1 through 5 to this Complaint. The Schedules correspond to Securitizations Nos. 1 through 5. Plaintiff incorporates into this paragraph 25 and alleges the contents of Item 25 of the Schedules.

MORRIS PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

Page 8 of 39

26. Banc of America Securities sold two of the five certificates directly to SSB. For each of those two certificates, Banc of America Securities sent numerous documents to SSB at its office in Henderson, Nevada. These documents included a term sheet (or its equivalent), the prospectus supplement for the certificate that was filed with the SEC, and drafts of some of the statistical tables to be included in the prospectus supplement. In these documents, Banc of America Securities and Barclays made statements of material fact about each certificate that they offered and sold to SSB.

## VI. DEFENDANTS' MATERIAL UNTRUE OR MISLEADING STATEMENTS ABOUT THE CERTIFICATES

27. The prospectus supplement for each of the five securitizations is available from the Securities and Exchange Commission's website. A URL for each prospectus supplement is included in Item 25 of each Schedule. Each prospectus supplement is incorporated into this Complaint by reference.

28. Plaintiff drew and analyzed random samples of 400 loans from the collateral pools of each of the securitizations in which SSB purchased certificates.

29. Many of the statements of material fact that the defendants made in the five prospectus supplements or in other documents that they sent to SSB were untrue or misleading. These untrue or misleading statements included the following.

### A. Untrue or Misleading Statements About the Loan-to-Value Ratios (LTVs) of the Mortgage Loans, and the Appraisals of the Properties, in the Collateral Pools

#### 1. LTVs

##### (a) The materiality of LTVs

30. The loan-to-value ratio of a mortgage loan, or LTV, is the ratio of the amount of the mortgage loan to the lower of the appraised value or the sale price of the mortgaged property when the loan is made. For example, a loan of

MORRIS PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

Page 9 of 39

$300,000 secured by a property valued at $500,000 has an LTV of 60%; a loan of $450,000 on the same property has an LTV of 90%. LTV is one of the most crucial measures of the risk of a mortgage loan, and the LTVs of the mortgage loans in the collateral pool of a securitization are therefore one of the most crucial measures of the risk of certificates sold in that securitization. LTV is a primary determinant of the likelihood of default. The lower the LTV, the lower the likelihood of default. For example, the lower the LTV, the less likely it is that a decline in the value of the property will wipe out the owner's equity and thereby give the owner an incentive to stop making mortgage payments and abandon the property, a so-called strategic default. LTV also is a primary determinant of the severity of losses on a loan that defaults. The lower the LTV, the lower the severity of losses if the loan defaults. Loans with lower LTVs provide greater "cushion," thereby increasing the likelihood that the proceeds of foreclosure will cover the unpaid balance of the mortgage loan.

31.    Beyond these fundamental effects on the likelihood and severity of default, LTVs also affect prepayment patterns (that is, the number of borrowers who pay off their mortgage loans before maturity and when they do so) and therefore the expected lives of the loans. Prepayment patterns therefore affect many aspects of certificates that are material to the investors that purchase them, including the life of the certificate and the timing and amount of cash that the investor will receive during that life.

32.    In addition, rating agencies use LTVs to determine the proper structuring and credit enhancement necessary for securities, such as the certificates that SSB purchased, to receive a particular rating. If the LTVs of the mortgage loans in the collateral pool of a securitization are incorrect, the ratings of certificates sold in that securitization will also be incorrect.

33.    An accurate denominator (that is, the value of the property) is essential to an accurate LTV. In particular, an inflated denominator will

MORRIS PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

Page 10 of 39

understate, sometimes greatly, the risk of a loan.  To return to the example above, if the property whose actual value is $500,000 is valued incorrectly at $550,000, then the ostensible LTV of the $300,000 loan falls from 60% to 54.5%, and the ostensible LTV of the $450,000 loan falls from 90% to 81.8%.  In either case, the LTV based on the incorrect appraised value understates the risk of the loan.

34.    For these reasons, a reasonable investor considers LTV critical to the decision whether to purchase a certificate in a securitization of mortgage loans.  Even small differences in the weighted average LTVs of the mortgage loans in the collateral pool of a securitization have a significant effect on both the risk and the rating of each certificate sold in that securitization and, thus, are essential to the decision of a reasonable investor whether to purchase any such certificate.

**(b)    Untrue or misleading statements about the LTVs of the mortgage loans in the collateral pools of these securitizations**

35.    In the prospectus supplements and in other documents that the defendants sent to SSB, the defendants made material untrue or misleading statements about the LTVs of the mortgage loans in the collateral pools of these securitizations.  Each such statement is identified in Item 35 of the Schedules to this Complaint.  Plaintiff incorporates into this paragraph 35, and alleges as though fully set forth in this paragraph, the contents of Item 35 of the Schedules.

36.    The defendants made these statements as statements of fact. Plaintiff is informed and believes, and based thereon alleges, that the defendants intended that these statements be understood as statements of fact.  SSB did understand the statements about the LTVs as statements of fact.  SSB had no access to appraisal reports or other documents or information from which it could verify the LTVs of the mortgage loans other than the statements that the defendants made about those LTVs.

MORRIS PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

       (c)     **An automated valuation model demonstrates that the defendants' statements about the LTVs were untrue because they were based on overstated valuations of the properties in the collateral pools.**

37.    The stated LTVs of many of the mortgage loans in each securitization were significantly lower than the true LTVs because the denominators (that is, the value of the properties that secured those loans) that were used to determine the disclosed LTVs were overstated to a material extent. The weighted-average LTVs presented in the prospectus supplements were also, therefore, untrue and misleading.

38.    Using a comprehensive, industry-standard automated valuation model (**AVM**), it is possible to determine the true market value of a certain property as of a specified date. An AVM is based on objective criteria like the condition of the property and the actual sale prices of comparable properties in the same locale shortly before the specified date, and is more consistent, independent, and objective than other methods of appraisal. AVMs have been in widespread use for many years. The AVM on which these allegations are based incorporates a database of 500 million sales covering ZIP codes that represent more than 97% of the homes, occupied by more than 99% of the population, in the United States. Independent testing services have determined that this AVM is the most accurate of all such models.

39.    For many of the properties that secured the mortgage loans, the model reported that LTVs presented in the prospectus supplements were understated. In particular, the model reported that the denominator (that is, the appraised value of the property as stated in the loan tape and compiled into the tables in the prospectus supplement) that was used to determine the disclosed LTV was 105% or more of the true market value as determined by the model as of the time the loan was originated. The model reported that the denominator that was used to determine the disclosed LTV was 95% or less of the true market value

MORRIS PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

on a much smaller number of properties.  Thus, the number of properties on which the value was overstated exceeded by far the number on which the value was understated, and the aggregate amount overstated exceeded by far the aggregate amount understated.

40.     To take an example, in Securitization No. 1, there were 1,083 mortgage loans in the collateral pool.  On 412 of the properties that secured those loans, the model reported that the denominator that was used to determine the disclosed LTV was 105% or more of the true market value and the amount by which the stated values of those properties exceeded their true market values in the aggregate was $76,400,997.  The model reported that the denominator that was used to determine the disclosed LTV was 95% or less of true market value on only 76 properties, and the amount by which the true market values of those properties exceeded the values reported in the denominators was $10,904,477.  Thus, the number of properties on which the value was overstated exceeded by more than five times the number on which the value was understated, and the aggregate amount overstated was seven times the aggregate amount understated.

41.     On one of the loans in Securitization No. 1, the amount of the loan was $955,500 and the stated value of the property was $1,365,000, resulting in a stated LTV of 70%.  The model, however, determined that the true value of the property was $635,000, resulting in a true LTV of 151%.  Thus, the stated value was higher than the true value by 115%, and the stated LTV was lower than the true LTV by 80.5%.  Both of these were huge discrepancies that were material to the credit quality of the loan.

42.     The overstated values of 412 properties made virtually every statement by the defendants about the LTVs of the mortgage loans untrue or misleading.  For example, the defendants stated that all mortgage loans had an LTV of 100% or less.  In fact, 130 of the mortgage loans had LTVs of over 100%.  Defendants also stated that the weighted-average LTVs of the loans in loan groups

MORRIS PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

1, 2, and 3 were 73.98%, 74.68%, and 75.10% respectively. In fact, the weighted-average LTVs of the groups were 81.3%, 89.0%, and 103.5% respectively. These differences were material for the reasons stated above.

43.    The results of the valuations by the automated model in this example are summarized in the following table.

| | |
|---|---|
| Number of loans | 1,083 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 412 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $76,400,997 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 76 |
| Aggregate amount by which the true market values of those properties exceeded their stated values | $10,904,477 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 130 |
| Weighted-average LTV, as stated by Defendants (group 1) | 73.98% |
| Weighted-average LTV, as determined by the model (group 1) | 81.3% |
| Weighted-average LTV, as stated by Defendants (group 2) | 74.68% |
| Weighted-average LTV, as determined by the model (group 2) | 89.0% |
| Weighted-average LTV, as stated by Defendants (group 3) | 75.10% |
| Weighted-average LTV, as determined by the model (group 3) | 103.5% |

44.    The model produced similar results for the mortgage loans in the collateral pool of each securitization. Details of the results of the model for each securitization are stated in Item 44 of the Schedules to this Complaint. Plaintiff incorporates into this paragraph 44, and alleges as though fully set forth in this paragraph, the contents of Item 44 of the Schedules.

MORRIS PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

Page 14 of 39

(d)     These statements also were misleading because the defendants omitted to state that there were additional liens on a material number of the properties that secured the mortgage loans in the collateral pools.

45.     As mentioned above, the LTV of a mortgage loan is a key determinant of the likelihood that the mortgagor will default in payment of the mortgage. The lower the LTV, the less likely that a decline in the value of the property will wipe out the owner's equity and thereby give the owner an incentive to stop making mortgage payments and abandon the property. Because LTV affects the behavior of borrowers so profoundly, accurate LTVs are essential to predicting defaults and prepayments by borrowers. Also as mentioned above, LTV affects the severity of loss on those loans that do default. The power of LTV to predict defaults, prepayments, and severities is a major reason why reasonable investors consider the LTVs of mortgage loans important to the decision whether to purchase a certificate in the securitization of those loans.

46.     The predictive power of the LTV of a mortgage loan is much reduced if there are additional liens on the same property. Additional liens reduce the owner's equity in the property and thereby increase the owner's incentive to stop making mortgage payments and abandon the property if the value of the property falls below the combined amount of all of the liens on the property (a strategic default). Additional liens also exacerbate delinquencies and defaults because they complicate the servicing of mortgage loans and the management of delinquencies and defaults. Servicers of the first-lien mortgage must then deal not only with the borrower, but also with the servicer of the second-lien mortgage. For example, the servicer of a single mortgage may want to grant a borrower forbearance while the borrower is unemployed and allow him or her to add missed payments to the principal of the loan and to resume payments when he or she is employed again. But the servicer of the second-lien mortgage may refuse

MORRIS PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

Page 15 of 39

1    such forbearance and initiate foreclosure and thereby force the borrower into

2    default on the first mortgage as well.

3         47.     According to land records, many of the properties that secured

4    mortgage loans in the collateral pool of each securitization were subject to liens in

5    addition to the lien of the mortgage in the pool at the time of the closing of these

6    securitizations[3]. The defendants failed to disclose any of these additional liens in

7    the prospectus supplements and in other documents that they sent to SSB. These

8    additional liens increased the risk that those owners would default in payment of

9    the mortgage loan in the pool.

10        48.     To take an example, of the 1,083 properties that secured the

11   mortgage loans in Securitization No. 1, at least 452 were subject to undisclosed

12   liens in addition to the lien of the mortgage in the pool. For example, defendants

13   stated that the weighted-average LTV of the properties in group 3 was 75.10%,

14   when, solely because of the additional liens on these 452 properties, the

15   weighted-average combined LTV of the properties in group 3 was 85.0%. This is a

16   significant difference.[4]

17        49.     On one of the loans, the original balance of the mortgage loan

18   was $591,200, the represented value of the property was $739,000, and the

19   reported LTV was 80%. On the date of the closing of this securitization, however,

20   there were undisclosed additional liens on this property of $147,800. Thus, when

21   all liens on the property were taken into account, the combined LTV of the loan

22   was 100%, which was 20% higher than the stated LTV on that loan. This was a

23   huge discrepancy that was material to the credit quality of the loan. In many

24   cases, the amount of the undisclosed additional liens was much greater than the

---

[3] Additional liens referred to in this Complaint and the Schedules exclude liens on the loan tapes that were originated on or before the date on which the mortgage loans in the pools were originated.

[4] The combined LTV is the ratio of all loans on a property to the value of the property.

MORRIS PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

1    owner's ostensible equity, putting the owner "under water" on the day on which

2    this securitization closed.

3         50.    In each securitization, defendants did not disclose the existence

4    of additional liens.  Details of the undisclosed additional liens in each

5    securitization are stated in Item 50 of the Schedules to this Complaint.  Plaintiff

6    incorporates into this paragraph 50, and alleges as though fully set forth in this

7    paragraph, the contents of Item 50 of the Schedules.  Plaintiff is informed and

8    believes, and based thereon alleges, that discovery will demonstrate that the

9    number of loans with additional liens is substantially higher than those disclosed

10   in the Schedules.

11        51.    Because the defendants did not disclose the existence or the

12   amounts of these additional liens, all of the statements that they made about the

13   LTVs of the mortgage loans were misleading.

14        **2.    Appraisals**

15        52.    As discussed above in paragraph 33, an accurate denominator

16   (value of the mortgaged property) is essential to calculating an accurate LTV.  An

17   accurate appraisal of the property, in turn, is essential to identifying an accurate

18   denominator.

19        53.    In connection with these securitizations, there was undisclosed

20   upward bias in appraisals of properties that secured mortgage loans and

21   consequent understatement of the LTVs of those loans.  This upward bias in

22   appraisals caused the denominators that were used to calculate the LTVs of many

23   mortgage loans to be overstated and, in turn, the LTVs to be understated.  The

24   defendants' statements regarding the LTVs of the mortgage loans in the collateral

25   pools were misleading because they omitted to state that the appraisals of a

26   material number of the properties that secured those loans were biased upwards.

27   In addition, the defendants stated that the appraisals conformed to the Uniform

28   Standards of Professional Appraisal Practice (**USPAP**), the professional standards

MORRIS PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

Page 17 of 39

that govern appraisers and appraisals (or to the standards of Fannie Mae and Freddie Mac, which required compliance with USPAP). Those statements were false because upwardly biased appraisals do not conform to USPAP.

> **(a)     The statements that the defendants made about the LTVs of the mortgage loans in the collateral pools were misleading because they omitted to state that the appraisals of a large number of the properties that secured those loans were biased upward, so that stated LTVs based on those appraisals were lower than the true LTVs of those mortgage loans.**

54.     The defendants omitted to state that the appraisals in these securitizations used inaccurate property descriptions, ignored recent sales of the subject and comparable properties, and used sales of properties that were not comparable, all in order to inflate the values of the appraised properties. The appraisals used to compute the LTVs of many of the mortgage loans in the collateral pools were biased upwards. As alleged in paragraphs 38 through 44, in each trust, the number of properties for which the value was overstated exceeded by far the number for which the value was understated, and the aggregate amount overstated exceeded by far the aggregate amount understated. These ratios for each trust are summarized in the following table:

| Securitization No. | Ratio of Number of Properties whose Value was Overstated to Number whose Value was Understated | Ratio of Amount of Overvaluation to Amount of Undervaluation |
|---|---|---|
| 1 | 5.4 | 7.0 |
| 2 | 3.7 | 4.3 |
| 3 | 2.9 | 2.7 |
| 4 | 4.9 | 7.3 |
| 5 | 2.6 | 2.2 |

These lopsided results demonstrate the upward bias in appraisals of properties that secured the mortgage loans in the collateral pools.

MORRIS PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

Page 18 of 39

55.     Plaintiff is informed and believes, and based thereon alleges, that a material number of the upwardly biased appraisals were not statements of the appraisers' actual findings of the values of the properties based on their objective valuations.

        (b)     **The statements by the defendants about compliance with USPAP were untrue because the appraisals of a large number of the properties that secured the mortgage loans were biased upward.**

56.     Appraisers and appraisals are governed by USPAP, which is promulgated by the Appraisal Standards Board.  The Preamble to USPAP states that its purpose "is to promote and maintain a high level of public trust in appraisal practice."  Both Fannie Mae and Freddie Mac require that appraisals comply with USPAP.

57.     USPAP includes the following provisions:

        (a)     USPAP Standards Rule 2-1(b)(iii) requires that "Each written or oral real property appraisal report must clearly and accurately set forth the appraisal in a manner that will not be misleading."

        (b)     USPAP Standards Rule 1-4(a) provides that "When a sales comparison approach is necessary for credible assignment results, an appraiser must analyze such comparable sales data as are available to indicate a value conclusion."

        (c)     USPAP Standards Rule 1-4(b) provides that "When a cost approach is necessary for credible assignment results, an appraiser must:

                (i)     develop an opinion of site value by an appropriate appraisal method or technique;

                (ii)    analyze such comparable cost data as are available to estimate the cost new of the improvements (if any); and

MORRIS PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

Page 19 of 39

(iii)   analyze such comparable data as are available to estimate the difference between the cost new and the present worth of the improvements (accrued depreciation)."

58.   The Appraisal Standards Board, which promulgates USPAP, also issues Advisory Opinions.  Although the Advisory Opinions do not establish new standards or interpret USPAP, they "are issued to illustrate the applicability of appraisal standards in specific situations."  Advisory Opinion 1 discussing "Sales History" states that "The requirement for the appraiser to analyze and report sales history and related information is fundamental to the appraisal process.  Just as the appraiser must analyze pending and recent sales of comparable properties, the appraiser must take into account all pending and recent sales of the subject property itself."

59.   In the prospectus supplements and in other documents that the defendants sent to SSB, the defendants made statements that the appraisals of properties that secured the mortgage loans in the collateral pools were made in compliance with USPAP or with the appraisal standards of Fannie Mae and Freddie Mac, which required compliance with USPAP.  Details of each such statement are stated in Item 59 of the Schedules to this Complaint.  Plaintiff incorporates into this paragraph 59, and alleges as though fully set forth in this paragraph, the contents of Item 59 of the Schedules.

60.   Plaintiff is informed and believes, and based thereon alleges, that a material number of mortgage loans in the collateral pools had appraisals conducted that deviated from USPAP.

61.   Each of the statements referred to in paragraph 59 was untrue because the appraisals of a material number of the properties referred to in each such statement did not conform to USPAP.

MORRIS PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

Page 20 of 39

62.     By each of the untrue and misleading statements referred to in paragraphs 35 and 59 above, the defendants materially understated the risk of the certificates that they issued, underwrote, or offered and sold to SSB.

**B.   Untrue or Misleading Statements About the Occupancy Status of the Properties That Secured the Mortgage Loans in the Collateral Pools**

**1.     The materiality of occupancy status**

63.     Residential real estate is usually divided into primary residences, second homes, and investment properties.  Mortgages on primary residences are less likely to default than mortgages on non-owner-occupied residences and therefore are less risky.  Occupancy status also influences prepayment patterns.

64.     Occupancy status (that is, whether the property that secures a mortgage is to be the primary residence of the borrower, a second home, or an investment property) is an important measure of the risk of a mortgage loan.  The percentage of loans in the collateral pool of a securitization that are not secured by mortgages on primary residences is an important measure of the risk of certificates sold in that securitization.  Other things being equal, the higher the percentage of loans not secured by primary residences, the greater the risk of the certificates.  A reasonable investor considers occupancy status important to the decision whether to purchase a certificate in a securitization of mortgage loans.

**2.     Untrue or misleading statements about the occupancy status of the properties that secured the mortgage loans in the collateral pools of these securitizations**

65.     In the prospectus supplements and in other documents that the defendants sent to SSB, the defendants made statements about the number of properties in the collateral pool of each securitization that were the primary residences of their owners.  To return to the example of Securitization No. 1, the defendants stated that, of the 1,083 mortgage loans in the collateral pool, 959 were

MORRIS PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

Page 21 of 39

secured by primary residences and 124 were not.  Details of each such statement in each securitization are stated in Item 65 of the Schedules to this Complaint. Plaintiff incorporates into this paragraph 65, and alleges as though fully set forth in this paragraph, the contents of Item 65 of the Schedules.

66.    These statements were untrue or misleading because (i) the stated number of mortgage loans secured by primary residences was higher than the actual number of loans in that category or (ii) the stated number of mortgage loans not secured by primary residences was lower than the actual number of loans in that category.

**3.    Basis of the allegations above that these statements about the occupancy status of the properties that secured the mortgage loans in the collateral pools were untrue or misleading**

67.    Because they are less risky than other mortgage loans, mortgage loans on primary residences usually have more favorable terms, including lower interest rates and more lenient underwriting standards, than mortgage loans on second homes and investment properties.  Applicants for loans on second homes and investment properties therefore have an incentive to state that the property will be their primary residence even when it will not.  Plaintiff is informed and believes, and based thereon alleges, that borrowers of many nonconforming securitized loans did so.

68.    A significant number of the properties in the collateral pool of each securitization that were stated to be primary residences actually were not. Moreover, Plaintiff is informed and believes, and based thereon alleges, that there is additional evidence of occupancy fraud in the loan files of many more of the mortgage loans in each collateral pool.

69.    With respect to some of the properties that were stated to be primary residences, the borrower instructed local tax authorities to send the bills for the taxes on the property to the borrower at an address other than the property

MORRIS PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

Page 22 of 39

itself. This is strong evidence that the mortgaged property was not the borrower's primary residence.

70.    In some states and counties, owners of a property are able to designate whether that property is his or her "homestead," which may reduce the taxes on that property or exempt the property from assets available to satisfy the owner's creditors, or both. An owner may designate only one property, which he or she must occupy, as his or her homestead. The fact that an owner in one of these jurisdictions does not designate a property as his or her homestead when he or she can do so is strong evidence that the property was not his or her primary residence. With respect to some of the properties that were stated to be primary residences, the owner could have but did not designate the property as his or her homestead. That omission is strong evidence that the property was not the borrower's primary residence.

71.    When a borrower actually occupies a newly mortgaged property, he or she normally notifies entities that send bills to him or her (such as credit card companies, utility companies, and local merchants) to send his or her bills to the address of the newly mortgaged property. Six months after the closing of the mortgage is ample time to complete this process. Six months after the closing of the mortgage, if the borrower is still receiving his or her bills at a different address, it is very likely that the borrower does not occupy the mortgaged property. For each securitization, a credit reporting agency specializing in mortgage loans compared the addresses in the borrowers' credit reports to the addresses of the mortgaged properties six months after the closing of the mortgage loans. Many borrowers whose mortgage loans were secured by properties that were stated in the loan tapes to be owner-occupied did not receive any bills at the address of the mortgaged property but did receive their bills at another address or addresses. It is very likely that each of these borrowers did not occupy the mortgaged property.

MORRIS PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

Page 23 of 39

72.    In Securitization No. 1, 68 owners of properties that were stated to be primary residences instructed local tax authorities to send the bills for the taxes on those properties to them at different addresses; 165 owners of properties that were stated to be primary residences could have, but did not, designate those properties as their homesteads; and 70 owners of properties that were stated to be primary residences did not receive any of their bills there six months after the mortgages were originated. Eliminating duplicates, for one or more of these reasons, 252 of the 959 properties that were stated to be primary residences actually were not. Thus, the number of properties that were not primary residences was not 124, as defendants stated, but at least 376, a material difference. The numbers of such loans in the collateral pool of each securitization are stated in Item 72 of the Schedules to this Complaint. Plaintiff incorporates into this paragraph 72, and alleges as though fully set forth in this paragraph, the contents of Item 72 of the Schedules.

73.    By each of the untrue and misleading statements referred to in paragraph 65, the defendants materially understated the risk of the certificates that they issued, underwrote, or offered and sold to SSB.

C.    **Untrue or Misleading Statements About the Underwriting Standards of the Originators of the Mortgage Loans in the Collateral Pools**

1.    **The materiality of underwriting standards and the extent of an originator's disregard of them**

74.    Originators of mortgage loans have written standards by which they underwrite applications for loans. An important purpose of underwriting is to ensure that the originator makes mortgage loans only in compliance with those standards and that its underwriting decisions are properly documented. An even more fundamental purpose of underwriting mortgage loans is to ensure that loans are made only to borrowers with credit standing and financial resources to repay the loans and only against collateral with value, condition, and marketability

MORRIS PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

Page 24 of 39

1  sufficient to secure the loans.  An originator's underwriting standards, and the

2  extent to which the originator does not follow its standards, are important

3  indicators of the risk of mortgage loans made by that originator and of certificates

4  sold in a securitization in which mortgage loans made by that originator are part

5  of the collateral pool.  A reasonable investor considers the underwriting standards

6  of originators of mortgage loans in the collateral pool of a securitization, and

7  whether an originator disregards its standards, important to the decision whether

8  to purchase a certificate in that securitization.

9       **2.**     **Untrue or misleading statements about the underwriting**
10                  **standards of originators of the mortgage loans**

11      75.     In the prospectus supplements and in other documents that the

12 defendants sent to SSB, the defendants made statements about the underwriting

13 standards of the originators of the mortgage loans in the collateral pool.  Details of

14 each such statement are stated in Item 75 of the Schedules to this Complaint.  They

15 included statements that the originators made mortgage loans in compliance with

16 their underwriting standards and made exceptions to those standards only when

17 compensating factors were present.  Plaintiff incorporates into this paragraph 75,

18 and alleges as though fully set forth in this paragraph, the contents of Item 75 of

19 the Schedules.

20      76.     Plaintiff is informed and believes, and based thereon alleges,

21 that these statements were untrue or misleading because the defendants omitted

22 to state that: (a) the originators were disregarding those underwriting standards;

23 (b) the originators were making extensive exceptions to those underwriting

24 standards when no compensating factors were present; (c) the originators were

25 making wholesale, rather than case-by-case, exceptions to those underwriting

26 standards; (d) the originators were making mortgage loans that borrowers could

27 not repay; and (e) the originators were failing frequently to follow

28

MORRIS PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

1  quality-assurance practices necessary to detect and prevent fraud intended to

2  circumvent their underwriting standards.

3      **3.  Basis of the allegations that these statements about the
           underwriting standards of the originators of the mortgage
4           loans in the collateral pools were untrue or misleading**

5          **(a)  The deterioration in undisclosed credit characteristics
                  of mortgage loans made by these originators**
6

7      77.   Plaintiff is informed and believes, and based thereon alleges,

8  that before and during the time of these securitizations, that Countrywide Home

9  Loans, Inc., which originated or acquired most of the loans and was the only

10  originator that was disclosed in the prospectus supplements, disregarded its stated

11  underwriting standards.  As a result of this relaxation, securitized mortgage loans

12  made between 2004 and the dates of these securitizations have experienced high

13  rates of delinquency and default.

14      78.   The high rates of delinquency and default were caused not so

15  much by any deterioration in credit characteristics of the loans that were expressly

16  embodied in underwriting standards and disclosed to investors, but rather by

17  deterioration in credit characteristics that were not disclosed to investors.

18      79.   Plaintiff is informed and believes that what was true about

19  recently securitized mortgage loans in general was true in particular of loans

20  originated by the entities that originated the loans in the collateral pools of these

21  securitizations, as the following figures demonstrate.  Taking the originator

22  Countrywide Home Loans, Inc., Figure 1 shows the rising incidence of early

23  payment defaults (or **EPDs**), that is, the percent of loans (by outstanding principal

24  balance) that were originated and sold into securitizations by Countrywide Home

25  Loans, Inc. and that became 60 or more days delinquent within six months after

26  they were made.  An EPD is strong evidence that the originator did not follow its

27  underwriting standards in making the loan.  Underwriting standards are intended

28  to ensure that loans are made only to borrowers who can and will make their

MORRIS PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

Page 26 of 39

mortgage payments.  Because an EPD occurs so soon after the mortgage loan was made, it is much more likely that the default occurred because the borrower could not afford the payments in the first place (and thus that the underwriting standards were not followed), than because of changed external circumstances unrelated to the underwriting of the mortgage loan (such as that the borrower lost his or her job).  The bars in Figure 1 depict the incidence of EPDs in loans originated by Countrywide Home Loans, Inc. that were sold into securitizations. The steady increase in EPDs is further evidence that the deterioration in the credit quality of those loans was caused by disregard of underwriting standards.



Figure 1: Percent of Loans Originated by Countrywide Home Loans Inc. or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination

80.    Figure 2 shows the weighted-average disclosed LTVs of the same loans and weighted-average disclosed credit scores of the borrowers.  These were nearly constant, showing that the deterioration in the credit quality of the loans was caused not by these disclosed factors, but rather by undisclosed factors.

MORRIS PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422



Figure 2: Percent of Loans Originated by Countrywide Home Loans Inc. or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination with Weighted-Average FICO and LTV

(b)     The poor performance of the loans in these pools demonstrates that the originators disregarded their underwriting guidelines when making these loans.

81.     As noted above, an EPD is evidence that the originator may have disregarded its underwriting standards in making the loan. The mortgage loans in some of the collateral pools of these securitization experienced EPDs. These EPDs are evidence that the originators of those loans may have disregarded their underwriting standards when making those loans. The number and percent of the loans in each pool that suffered EPDs are stated in Item 81 of the Schedules to this Complaint. Plaintiff incorporates into this paragraph 81, and alleges as though fully set forth in this paragraph, the contents of Item 81 of the Schedules.

82.     A high rate of delinquency at any time in a group of mortgage loans is also evidence that the originators of those loans may have disregarded their underwriting standards in making the loans. A common measure of serious delinquency is the number of loans on which the borrowers were ever 90 or more days delinquent in their payments. The mortgage loans in the collateral pools have experienced very high rates of delinquencies by this measure. This high rate

MORRIS PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

of delinquencies is strong evidence that the originators of those loans may have disregarded their underwriting standards when making those loans. The number and percent of the loans in each pool that suffered 90 or more days delinquencies are stated in Item 82 of the Schedules to this Complaint. Plaintiff incorporates into this paragraph 82, and alleges as though fully set forth in this paragraph, the contents of Item 82 of the Schedules.

83.     A second common measure of delinquency is the number of loans on which the borrowers are 30 or more days delinquent as of October 31, 2011. This high rate of delinquencies is strong evidence that the originators of those loans may have disregarded their underwriting standards when making those loans. The number and percent of the loans in each pool that were 30 or more days delinquent on October 31, 2011 are stated in Item 83 of the Schedules to this Complaint. Plaintiff incorporates into this paragraph 83, and alleges as though fully set forth in this paragraph, the contents of Item 83 of the Schedules.

        (c)     **Other evidence shows that Countrywide Home Loans, Inc. disregarded its underwriting standards.**

84.     In addition to the statistical data cited above, other evidence shows that Countrywide Home Loans, Inc. (which originated or acquired most of the loans in the collateral pools of these securitizations), did not follow its stated underwriting standards.

85.     Many loans that Countrywide originated were outside its already lax underwriting standards, because Countrywide frequently disregarded even those standards and made loans that borrowers could not afford to pay. *See* Complaint at 4, *S.E.C. v. Mozilo*, No. CV 09-3994-JFW (MANx) (C.D. Cal. 2009). In a memorandum dated December 13, 2007, the enterprise risk assessment officer at Countrywide stated that "borrower repayment capacity was not adequately assessed by the bank during the underwriting process for home equity mortgage loans." *Id.* at 23-24. In an email dated June 1, 2006, Countrywide's Chairman and

MORRIS PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

Page 29 of 39

1   CEO Angelo Mozilo wrote that borrowers "are going to experience a payment
2   shock which is going to be difficult if not impossible for them to manage." *Id.* at
3   37.

4          86.    Moreover, Countrywide "viewed borrowers as nothing more
5   than the means for producing more loans, originating loans with little or no regard
6   to borrowers' long-term ability to afford them." Complaint at 5, *California v.*
7   *Countrywide Financial Corp.*, No. LC083076 (Cal. Super. 2008). Indeed, "to increase
8   market share, [Countrywide] dispensed with many standard underwriting
9   guidelines . . . to place unqualified borrowers in loans which ultimately they could
10  not afford." Complaint at 5, *Washington v. Countrywide Financial Corp.*, No.
11  09-2-01690-6 (Wash. Super. 2009).

12         87.    Plaintiff is informed and believes, and based thereon alleges,
13  that Countrywide did not adhere to its own underwriting standards, but instead
14  abandoned, ignored, or disregarded them. According to internal Countrywide
15  documents, Mozilo admitted that loans "had been originated 'through our
16  channels with disregard for process [and] compliance with guidelines.'" Complaint
17  at 20-21, *S.E.C. v. Mozilo*, No. CV 09-3994-JFW (MANx) (C.D. Cal. 2009).
18  Moreover, Countrywide did whatever it took to sell as many loans as it could, as
19  quickly as possible, including by disregarding its underwriting standards. *See*
20  Complaint at 5, *California v. Countrywide Financial Corp.*, No. LC083076 (Cal. Super.
21  2008).

22         88.    Plaintiff is informed and believes, and based thereon alleges,
23  that Countrywide made exceptions to its underwriting standards where no
24  compensating factors existed, resulting in higher rates of default and used as
25  "compensating factors" variables such as a borrower's credit score and LTV, which
26  had already been used to determine that the loan did not fall within the
27  guidelines. Complaint at 20-21, *S.E.C. v. Mozilo*, No. CV 09-3994-JFW (MANx)
28

MORRIS PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

1  (C.D. Cal. 2009).  Such "compensating factors" did not actually compensate for

2  anything and did not "offset" any risk.

3        89.     According to the Financial Crisis Inquiry Commission,

4  Countrywide made loans that it knew borrowers could not afford to pay.  In its

5  final report, the FCIC noted that "Countrywide recognized that many of the loans

6  they were originating could result in 'catastrophic consequences'" because the

7  borrowers could not afford to pay.  FINANCIAL CRISIS INQUIRY COMMISSION, THE

8  FINANCIAL INQUIRY REPORT xxii (Public Affairs Reports, 2011).

9        90.     Finally, Plaintiff is informed and believes, and based thereon

10  alleges, that Countrywide did not apply its underwriting standards in accordance

11  with all federal, state, and local laws.  Countrywide has entered into agreements to

12  settle charges of violation of predatory lending, unfair competition, false

13  advertising, and banking laws with the Attorneys General of at least 38 states,

14  including Alaska, Arizona, California, Colorado, Connecticut, Delaware, Florida,

15  Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine,

16  Maryland, Michigan, Mississippi, Montana, Nebraska, Nevada, New Jersey, New

17  Mexico, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania,

18  Rhode Island, South Dakota, Tennessee, Virginia, Washington, West Virginia,

19  Wisconsin, and Wyoming.  The Attorneys General of these states alleged that

20  Countrywide violated state predatory lending laws by (i) making loans it could

21  not have reasonably expected borrowers to be able to repay; (ii) using high

22  pressure sales and advertising tactics designed to steer borrowers towards

23  high-risk loans; and (iii) failing to disclose to borrowers important information

24  about the loans, including the costs and difficulties of refinancing, the availability

25  of lower cost products, the existence and nature of prepayment penalties, and that

26  advertised low interest rates were merely "teaser" rates that would adjust upwards

27  dramatically as soon as one month after closing.  Eighty-eight percent of the

28

MORRIS PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

Page 31 of 39

mortgages that were covered by the settlement with the Attorneys General were sold into securitization trusts, like the five in which SSB purchased certificates.

91.    By each of the untrue and misleading statements referred to in paragraph 75 above, the defendants materially understated the risk of the certificates that they underwrote or offered and sold to SSB.  Moreover, Plaintiff is informed and believes, and based thereon alleges, that discovery will yield additional evidence that the originators disregarded their underwriting guidelines when making the mortgage loans in the collateral pools of these securitizations.

**D.    The Large Number of Mortgage Loans in the Collateral Pools About Which the Defendants Made Material Untrue or Misleading Statements Made Their Statements About the Ratings of SSB's Certificates Untrue and Misleading.**

92.    In the prospectus supplements and in other documents that the defendants sent to SSB, the defendants made statements about the rating of each certificate by Moody's Investors Service, Standard & Poor's Rating Service, and Fitch Ratings.  They stated that one or more of those agencies rated each such certificate investment grade.  Details of each such statement are stated in Item 92 of the Schedules to this Complaint.  Plaintiff incorporates into this paragraph 92, and alleges as though fully set forth in this paragraph, the contents of Item 92 of the Schedules.

93.    The ratings were important to the decision of any reasonable investor whether to purchase the certificates.  Many investors, including SSB, have investment policies that require a certain minimum rating for all investments.  The policy of SSB was to purchase only certificates that were rated at least investment grade.

94.    These statements by the defendants about the ratings of the certificates they issued, underwrote, or offered and sold to SSB were misleading because the defendants omitted to state that the ratings did not take into account

MORRIS PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

Page 32 of 39

all the material untrue or misleading statements about specific mortgage loans in the collateral pool.  These include:

(a)    loans in which the LTVs were materially understated as shown by the AVM;

(b)    loans in which the LTVs were misleading as a result of undisclosed additional liens;

(c)    loans that suffered EPDs, strong evidence that the originators may have disregarded the underwriting standards in making those loans; and

(d)    loans in which the properties were stated to be owner-occupied, but were not.

95.    In Securitization No. 1, there were 412 loans whose LTVs were materially understated as shown by the AVM, 452 loans in which the LTVs were misleading because of undisclosed additional liens, 14 loans that suffered EPDs, and 252 loans in which the properties were stated to be owner-occupied but were not.  Eliminating duplicates, there were 782 loans (or 72% of the loans in the collateral pool) about which defendants made untrue or misleading statements. The numbers of such loans in the collateral pool of each securitization are stated in Item 95 of the Schedules to this Complaint.  Plaintiff incorporates into this paragraph 95, and alleges as though fully set forth in this paragraph, the contents of Item 95 of the Schedules.

96.    Plaintiff is informed and believes, and based thereon alleges, that loan files and other documents available only through discovery will prove that those statements were untrue or misleading with respect to many more loans as well.

97.    By these untrue and misleading statements, the defendants materially understated the risk of the certificates that they issued, underwrote, or offered and sold to SSB.  Moreover, Plaintiff is informed and believes, and based

MORRIS PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

Page 33 of 39

1   thereon alleges, that the defendants materially understated the risk of the

2   certificates that they issued, underwrote, or offered and sold to SSB.

### VII.  STATUTE OF LIMITATIONS

4   98.     None of the claims in this Complaint was barred by the statute

5   of limitations on February 27, 2009, the date on which Plaintiff became receiver for

6   SSB, because, even in the exercise of reasonable diligence, SSB should not have

7   discovered, and did not discover, the untrue or misleading statements by

8   defendants more than one year before that date.  Under 12 U.S.C. § 1821(d)(14),

9   the statute of limitations on all of the claims in this Complaint is extended to three

10  years from February 27, 2009.  Plaintiff discovered the untrue or misleading

11  statements by defendants in 2011 in the course of its investigation of possible

12  claims of SSB that Plaintiff is authorized to bring as receiver for SSB.  The claims in

13  this Complaint are timely.

### VIII.  CAUSES OF ACTION

**A.    Untrue or Misleading Statements in the Sale of Securities Under Section 90.570 of the NSA**

17  99.     Plaintiff hereby incorporates by reference, as though fully set

18  forth, paragraphs 1 through 98.

19  100.    Banc of America Securities, as an underwriter of two

20  certificates, sent communications and solicitations to SSB in Henderson, Nevada,

21  for the purpose of inducing SSB to purchase the two certificates in Securitizations

22  1 and 2, which Banc of America Securities sold to SSB.  The sale of these two

23  certificates occurred in Nevada because employees or agents of Banc of America

24  Securities directed communications about the certificates and solicitations to

25  purchase the certificates to SSB there, and because SSB received those

26  communications and solicitations there.

27  101.    In doing the acts alleged in the sale to SSB of the two certificates

28  in Securitizations 1 and 2, Banc of America Securities violated Section 90.570 of the

MORRIS PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

Page 34 of 39

1  NSA by offering or selling securities in this State by means of written
2  communications that included untrue statements of material fact or omitted to
3  state material facts necessary in order to make the statements made, in light of the
4  circumstances under which they were made, not misleading.

5      102.    Barclays was an underwriter of the certificate that Banc of
6  America Securities sold to SSB in Securitization 1.  The sale of this certificate
7  occurred in Nevada because employees or agents of Banc of America Securities
8  directed communications about the certificates and solicitations to purchase the
9  certificates to SSB there, and because SSB received those communications and
10  solicitations there.

11      103.    In doing the acts alleged in the sale to SSB of one certificate in
12  Securitization 1, Barclays violated Section 90.570 of the NSA by offering or selling
13  securities in this State by means of written communications that included untrue
14  statements of material fact or omitted to state material facts necessary in order to
15  make the statements made, in light of the circumstances under which they were
16  made, not misleading.

17      104.    Plaintiff has disposed of all of the certificates.

18      105.    Under Section 90.660 of the NSA, Plaintiff is entitled to recover
19  the consideration paid for each of these certificates, plus interest at the legal rate
20  from the date of purchase to the date on which it recovers the purchase price,
21  minus the amount of income received on the certificate, minus the greater of the
22  value of the security when the plaintiff disposed of it or the consideration that the
23  plaintiff received for the security.

24  **B.  Untrue or Misleading Statements in the Sale of Securities Under
     Section 12(a)(2) of the 1933 Act**

25

26      106.    Plaintiff hereby incorporates by reference, as though fully set

27  forth, paragraphs 1 through 105.

28

MORRIS PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

107. SSB purchased each of the two certificates in Securitizations 1 and 2 that Banc of America Securities sold SSB when they were initially offered to the public.

108. Banc of America Securities and Barclays solicited SSB to purchase these certificates, and sold the certificates to SSB, by means of the prospectus supplements and other written offering materials and oral communications.

109. The prospectus supplements and other written offering materials and oral communications that the defendants sent to SSB contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.

110. SSB did not know when it purchased these certificates that the statements in the prospectus supplements and other written offering materials and oral communications that the defendants sent to SSB were untrue or misleading.

111. In doing the acts alleged in the sale to SSB of the certificates in Securitizations 1 and 2, Banc of America Securities violated Section 12(a)(2) of the 1933 Act in the sale to SSB of the certificates in Securitizations 1 and 2.

112. In doing the acts alleged in the sale to SSB of the certificate in Securitization 1, Barclays violated Section 12(a)(2) of the 1933 Act in the sale to SSB of the certificate in Securitization 1.

113. Plaintiff expressly excludes from this cause of action any allegation that could be construed as alleging fraud or intentional or reckless conduct. This cause of action is based solely on claims of strict liability or negligence under the 1933 Act.

114. When it failed on February 27, 2009, SSB had not discovered that the defendants made untrue or misleading statements about the certificates.

MORRIS PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

1   Plaintiff discovered that the defendants made untrue or misleading statements in

2   the sale of the securities in 2011 in the course of its investigation.

3         115.   Plaintiff has suffered a loss on each of these certificates.

4         116.   Plaintiff is entitled to recover its damages.

5   **C.**    **Untrue or Misleading Statements in a Registration Statement Under Section 11 of the 1933 Act**

6

7         117.   Plaintiff hereby incorporates by reference, as though fully set

8   forth, paragraphs 1 through 116.

9         118.   Banc of America Securities is an underwriter of the certificates

10   in Securitizations 1, 2, and 3.  In doing the acts alleged, Banc of America Securities

11   violated Section 11 of the 1933 Act in connection with the sale to SSB of each of the

12   certificates in Securitizations 1, 2, and 3.

13         119.   Barclays is an underwriter of Securitization 1.  In doing the acts

14   alleged, Barclays violated Section 11 of the 1933 Act in connection with the sale to

15   SSB of the certificate in Securitization 1.

16         120.   Morgan Stanley is an underwriter of the certificates in

17   Securitizations 4 and 5.  In doing the acts alleged, Morgan Stanley violated Section

18   11 of the 1933 Act in connection with the sale to SSB of the certificates in

19   Securitization 4 and 5.

20         121.   The certificates in these securitizations were issued pursuant or

21   traceable to registration statements.  Details of each registration statement and

22   each certificate are stated in Item 25 of the Schedules.

23         122.   The registration statements, as amended by the prospectus

24   supplements, contained untrue statements of material fact and omitted to state

25   material facts necessary in order to make the statements, in the light of the

26   circumstances under which they were made, not misleading.  These untrue and

27   misleading statements included all of the untrue and misleading statements

28   described in paragraphs 30 through 97.

MORRIS PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

Page 37 of 39

123. SSB purchased each certificate before the issuer made an earning statement covering a period of at least twelve months generally available.

124. Plaintiff expressly excludes from this cause of action any allegation that could be construed as alleging fraud or intentional or reckless conduct. This cause of action is based solely on claims of strict liability or negligence under the 1933 Act.

125. SSB did not know when it purchased these certificates that the statements in the registration statements, as amended by the prospectus supplements, were untrue or misleading.

126. When it failed on February 27, 2009, SSB had not discovered that the defendants made untrue or misleading statements about the certificates. Plaintiff discovered that the defendants made untrue or misleading statements in the sale of the securities in 2011 in the course of its investigation.

127. SSB has suffered a loss on each of these certificates.

128. Plaintiff is entitled to recover damages as described in 15 U.S.C. § 77k(e).

MORRIS PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422

PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against defendants as follows:

1.    For damages in an amount to be determined at trial in excess of $10,000.00;

2.    For attorneys' fees, costs of court, and pre- and post-judgment interest; and

3.    For such other and further relief as the Court deems just and proper.

MORRIS PETERSON

By _____
Robert McCoy, No. 9121
Joni A. Jamison, No. 11614
900 Bank of America Plaza
300 South Fourth Street
Las Vegas, Nevada  89101

David J. Grais (*pro hac vice* to be submitted)
Mark B. Holton (*pro hac vice* to be submitted)
Leanne M. Wilson (*pro hac vice* to be submitted)
Grais & Ellsworth LLP
40 East 52nd Street
New York, New York  10022

Attorneys for Plaintiff Federal Deposit Insurance Corporation, as Receiver for Security Savings Bank

MORRIS PETERSON
ATTORNEYS AT LAW
900 BANK OF AMERICA PLAZA
300 SOUTH FOURTH STREET
LAS VEGAS, NEVADA 89101
702/474-9400
FAX 702/474-9422