O

LINKS: 97; 79

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re COUNTRYWIDE FINANCIAL CORPORATION MORTGAGE-BACKED SECURITIES LITIGATION | Case No. 2:11-ML-02265-MRP (MANx) |
| FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR SECURITY SAVINGS BANK | Case No. 2:12-CV-6690 MRP (MANx) |
| Plaintiff, | Case No. 2:12-CV-6692 MRP (MANx) |
| v. | |
| BANC OF AMERICA SECURITIES LLC, *et al.*, | **Order Re Motions to Dismiss the First Amended Complaints** |
| Defendants. | |
| FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR SECURITY SAVINGS BANK | |
| Plaintiff, | |
| v. | |
| COUNTRYWIDE FINANCIAL CORPORATION, *et al.*, | |
| Defendants. | |

## I.    Background

Security Savings Bank ("SSB,") a federally insured depository institution, failed on February 27, 2009.  Plaintiff Federal Deposit Insurance Corporation ("FDIC") was appointed receiver for Security Savings Bank.  The FDIC has the authority to pursue any claims held by SSB.  12 U.S.C. § 1821(d)(2)(A).  The FDIC files these lawsuits asserting securities law claims arising from SSB's purchase of six residential mortgage-backed securities ("RMBS" or "certificates").

The certificates that SSB purchased were created through a process known as "securitization."  *See, e.g., Bank Hapoalim B.M. v. Bank of Am. Corp.*, 12-CV-4316, 2012 WL 6814194, at *1 (Dec. 21, 2012).  In both cases, non-defendant Countrywide Home Loans, Inc. extended home loans to borrowers.  The loans were pooled, sold to trusts, and backed certificates issued by trusts.  Those certificates entitled the holders to receive cash flows from the pool of mortgage loans.  The certificates were sold to underwriters, who sold them to SSB.  According to the FDIC, the documents used to create and market the securities (called the "Offering Documents,") included materially untrue or misleading statements.

On February 24, 2012, the FDIC filed two separate lawsuits against the Defendants in Nevada state court alleging those misrepresentations.  The Amended Complaint in the 12-CV-6690 matter ("6690 Complaint") is brought against defendants Banc of America Securities LLC ("Banc of America Securities"), Barclays Capital Inc. ("Barclays,") and Morgan Stanley & Company LLC f/k/a Morgan Stanley & Company, Inc. (collectively, the "6690 Defendants") for their role in selling or underwriting five certificates[1] sold to SSB.  In a second suit, the FDIC sues Countrywide Securities Corporation, CWALT, Inc., Countrywide

---

[1]      CWALT 2006-29T1 B-1, CWALT 2006-26CB B-2, CWALT 2006-21CB B-2, CWALT 2005-74T1 B-2 and CWALT 2005-19CB B-2.

Financial Corporation and Bank of America Corporation ("6692 Defendants") for selling, underwriting and issuing one certificate[2] to SSB, and controlling and succeeding to the liabilities of the primary actors (the Amended Complaint in the 12-CV-6692 action is called the "6692 Complaint").

After the Defendants removed these cases and they were transferred to this Court, the FDIC filed these Amended Complaints.  The complaints allege that the Offering Documents included false representations of the ratio of the value of the loans to the underlying value of the homes, the appraisal value of the homes, the rate of occupancy by the owners of the properties, the underwriting standards used to originate the home loans and the credit ratings of the certificates.  Despite the fact that the FDIC filed different lawsuits, the factual allegations and claims of misrepresentation are identical in each suit.  The FDIC argues that the 6690 Defendants are liable for those false statements under Section 11 of the federal Securities Act of 1933, and that Banc of America Securities LLC and Barclays are liable under the Nevada Securities Act and Sections 12(a)(2) of the Securities Act for two of the certificates.[3]  The FDIC claims that Countrywide Securities Corporation and CWALT, Inc. are liable for false statements for the certificate in the 6692 Complaint under Section 11, that Countrywide Financial Corporation is liable as a controlling person under Section 15, and that Bank of America Corporation is liable as successor of these entities.

Both the 6690 and 6692 Defendants move to dismiss on the grounds that the Complaints are time-barred.[4]  According to the Defendants, the statute of limitations on the federal claims had already run as of February 27, 2009, when the

---

[2]    CWALT 2005-83CB B-2.
[3]    CWALT 2006-29T1 B-1 and CWALT 2006-26CB B-2.
[4]    Because the Complaints are identical, and the legal issues in the motions to dismiss are nearly identical, the Court will resolve the two motions in this single Order.  The Court is puzzled as to why the FDIC has initiated two separate suits, instead of filing one complaint against the sellers, underwriters, and issuers of the certificates.

FDIC became receiver of SSB.  They urge that there is no reason to extend the statute of limitations.  Even if any federal claims were live on February 27, 2009, Defendants argue that the statute of repose now bars the FDIC's claim.   The 6690 Defendants also argue that the statute of limitations for the Nevada Securities Act expired by February 27, 2009, and that Nevada, the transferor court, does not have personal jurisdiction over Barclays.

## II.   All but One of the Federal Securities Claims were Untimely on February 27, 2009

The statute of limitations for federal claims under the Securities Act of 1933 is "one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence," and "[i]n no event shall any such action be brought to enforce a liability created under section [11] . . . more than three years after the security was *bona fide* offered to the public, or under section [12(a)(2)] more than three years after the sale."  15 U.S.C. § 77m ("Section 13").  The one-year statute of limitations on any live claims on February 27, 2009 was extended by at least three years.  12 U.S.C. § 1821(d)(14) ("Section 1821") ("the applicable statute of limitations with regard to any action brought by the Corporation as conservator or receiver shall be . . . the longer of the 3-year period beginning on the date the claims accrues," which in this case is "the date of the appointment of the Corporation as conservator or receiver").

The Defendants argue, though, that the three-year statute of repose is not extended by Section 1821, which would mean that the Securities Act claims are untimely for any security purchased before February 24, 2009.  The relevant question under Ninth Circuit precedent is whether the term "statute of limitations" in Section 1821 was understood to include the "statute of repose" when the extender statute was passed.  *McDonald v. Sun Oil Co.*, 548 F.3d 774, 781 (9th Cir. 2008).   The extender statute was enacted in 1989.  *See* Financial Institutions

Reform, Recovery, and Enforcement Act of 1989, Pub. L. 101-73, § 212, 103 Stat. 183 ("CONSERVATORSHIP AND RECEIVERSHIP POWERS OF THE CORPORATION.")  The Ninth Circuit determined that "[t]he term 'statute of limitations' was ambiguous regarding whether it included statutes of repose . . . in 1986."  *McDonald*, 548 F.3d at 781.  This Court has concluded that because Congress and numerous federal judges used the word "limitation" interchangeably to refer to both statutes of limitations and repose between 1986 and 2008, the term "statute of limitations" did not exclude periods of repose in 2008.  *Fed. Hous. Fin. Agency v. Countrywide Fin. Corp.*, No. 12-CV-1059, 2012 WL 5275327, at *8 (C.D. Cal. Oct. 18, 2012).  That means the term did not exclude periods of repose in 1989.  Ambiguous statutes of limitations must be interpreted in "a light most favorable to the government."  *F.D.I.C. v. Former Officers and Dirs. of Metro. Bank*, 884 F.2d 1304, 1309 (9th Cir. 1989).   Therefore, the extender statute of Section 1821 extends both statutes of limitations and repose by at least three years from the date of appointment of the FDIC as receiver.  Any claims still viable on February 27, 2009 could be brought by the FDIC until February 27, 2012.

Three of the FDIC's claims, though, were clearly not live on February 27, 2009.  Those claims were brought for violations of Section 11 and are based on three securities issued pursuant to shelf registration statements filed before December 1, 2005.  *See* 6692 Complaint ¶ 27, Schedule Item 27(g) (CWALT 2005-83CB B-2 was "issued pursuant or traceable to a registration statement filed by CWALT, Inc. with the SEC on form S-3 on July 25, 2005."); 6690 Complaint ¶ 25, Schedule 4 Item 27(h) (CWALT 2005-74T1 B-2 was "issued pursuant or traceable to a registration statement filed by CWALT, Inc. with the SEC on form S-3 on July 25, 2005."); 6690 Complaint ¶ 25, Schedule 5 Item 27(h) (CWALT 2005-19CB B-2 was "issued pursuant or traceable to a registration statement filed by CWALT, Inc. with the SEC on form S-3 on April 21, 2005.").  A mortgage-backed security was *bona fide* offered to the public, for purposes of the statute of

repose, on the effective date of the registration statement for registration statements filed before December 1, 2005. *Me. State Ret. Sys. v. Countrywide Fin. Corp.* ("*Me. State I*,") 722 F. Supp. 2d 1157, 1165 n.8 (C.D. Cal. 2010). The three-year repose period for these securities ended by July 25, 2008 at the latest. Section 11 claims based on CWALT 2005-83CB B-2, CWALT 2005-74T1 B-2 and CWALT 2005-19CB B-2 were not live on February 27, 2009 when the FDIC became receiver. Because Section 1821 does not revive time-barred claims, the FDIC could not bring those claims unless the statute of limitations was tolled on another ground.

The 6690 Defendants argue that the legal claims on the remaining securities, CWALT 2006-29T1 B-1, CWALT 2006-26CB B-2 and CWALT 2006-21CB B-2, are also time-barred, because the one-year statute of limitation ended before February 27, 2009. The statute of limitations in Section 13 commences "when the plaintiff did or should have actually discovered that the defendant made an 'untrue statement or omission.'" *Fed. Deposit Ins. Corp. as Receiver for Strategic Capital Bank v. Countrywide Fin. Corp.*, 12-CV-4354, 2012 WL 5900973, at *3 (C.D. Cal. Nov. 21, 2012) (citing *Merck & Co., Inc. v. Reynolds*, 130 S.Ct. 1784 (2010)). A plaintiff did or should have actually discovered misstatements when a "'reasonably diligent plaintiff would have sufficient information about that fact to adequately plead it in a complaint . . . with sufficient detail and particularity to survive a 12(b)(6) motion to dismiss.'" *Id.* (citing *City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 175 (2d Cir. 2011)).

The Section 11, 12(a)(2) and 15 claims were only live on February 27, 2009 if SSB would not have been able, by February 27, 2008, to plead in a complaint that the Offering Documents included misstatements.[5] The court "can take judicial

---

[5]     As explained in *Strategic Capital*, Sections 11, 12(a)(2) and 15 are strict liability statutes, so the one-year period commences once the plaintiff knows the Offering Documents

notice of publications introduced to indicate what was in the public realm at the time that would . . . show public information that could have enabled [plaintiff] to state a claim under the Securities Act." *Strategic Capital Bank,* 2012 WL 5900973, at *3 (citations omitted).  This Court has focused on news and opinion articles and court filings and decisions that showed that the originators of the securities had abandoned their underwriting standards and inflated appraisal values, and that such information was sufficient to offer a well-pled complaint on the relevant date. *Id.* at **3–6.  The Defendants cite legal complaints and news articles they argue were sufficient for a reasonable investor to have discovered the misstatements the FDIC now complains of by February 27, 2008.

The Court has previously ruled that reasonable investors had sufficient information to plead violations of federal securities laws by May 22, 2008.  *Id.* The Court has also found that the "inquiry notice" standard, which accrues when "a reasonable investor would have noticed something was amiss," was triggered by February 14, 2008. *Mass. Mut. Life Ins. Co. v. Countrywide Fin. Corp.*, No. 11-CV-10414, 2012 WL 1322884, at *3 (C.D. Cal. Apr. 16, 2012) (citations omitted). The Court has never explicitly ruled as a matter of law that the statute of limitations accrues under the *Merck* discovery standard by February 27, 2008.

The Court refuses to do so.  This Court has recognized that "a reasonable investor would have been aware of problems with underwriting at Countrywide by early 2008," from the derivative and numerous securities lawsuits filed by investors, as well as the state court mortgage-backed securities complaint in *Luther v. Countrywide Home Loans Servicing LP*, No. BC380698 (Cal. Super. Ct. Nov. 14, 2007) ("*Luther* Complaint") (attached here as Exhibit 2 to the Request for Judicial Notice in Supp. of Defs.' Mot. to Dismiss Am. Compl. ("6690 RJN,") 12-

---

contained misstatements, regardless of whether the plaintiff knew any other facts. *Strategic Capital Bank*, 2012 WL 5900973, at *3 n.6.

1   CV-6690, ECF No. 98).  *Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*,
2   802 F. Supp. 2d 1125, 1136–1137 (C.D. Cal. 2011).  However, critical information
3   was revealed to investors between February 27 and May 22 in 2008.

4         As a general rule, "paragraphs in a complaint that are either based on, or rely
5   on, complaints in other actions that have been dismissed, settled, or otherwise not
6   resolved, are, as a matter of law, immaterial within the meaning of FED. R. CIV. P.
7   12(f)."  *RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382, 403 (S.D.N.Y. 2009);
8   *Me. State Ret. Sys. v. Countrywide Fin. Corp.*, ("*Me. State III*"), 10-CV-00302,
9   2011 WL 4389689, at *20 (C.D. Cal. May 5, 2011) (striking paragraphs copied
10  from other complaints when plaintiffs "have not reasonably investigated the
11  allegations").[6]  On February 27, 2008, none of the filed complaints had been tested
12  or resolved by any court.  This Court ruled that the derivative complaint met the
13  Rule 12(b)(6) standard on May 14, 2008.  *In re Countrywide Fin. Corp. Derivative*
14  *Litig.*, 554 F. Supp. 2d 1044 (C.D. Cal. 2008).  Before May 14, the Court cannot
15  rule as a matter of law that SSB should have discovered that the information in the
16  other complaints was true, which is necessary before filing a complaint.  *Me. State*
17  *III*, 2011 WL 4389689, at *20.

18        The Court realizes that it has held that before February 27, 2008, reasonable
19  investors were on notice or aware that something was amiss at Countrywide.
20  *Mass. Mut.*, 2012 WL 1322884.  That notice may have led to an investigation
21  which would have revealed the underwriting problems at Countrywide and
22  supported a well-pled complaint that the Offering Documents contained
23  misstatements.  This Court later did hold that both the derivative and securities
24  complaints met the Rule 12(b)(6) standard, and properly alleged that Countrywide
25  had abandoned its underwriting standards and inflated appraisals, the essence of

26

27        [6]      In fact, this is an argument that some of the same Defendants, and their counsel, have
28  offered numerous times before this Court in the MDL.  *See, e.g.,* Notice of Mot. and Mot. to
    Strike, *Am. Int'l Grp., Inc. v. Bank of Am. Corp.*, 11-CV-10549, ECF No. 151.

this claim. *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d at 1058, 1060; *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1145 (C.D. Cal. 2008). However, that is not the legal standard for "discovery" in this case. That standard is only met when a "plaintiff has uncovered – or a reasonably diligent plaintiff would have uncovered – enough information about the defendant's" conduct to satisfy the Rule 12(b)(6) pleading standard. *City of Pontiac Gen. Emps.' Ret. Sys*, 637 F.3d at 175.[7] The Court cannot hold, given the judicially noticeable materials, that a reasonably diligent investor in mortgage-backed securities could have pled a sufficient complaint as of February 27, 2008.

The Court cannot rule as a matter of law that the statute of limitations had commenced for a reasonable investor on February 27, 2008, but the FDIC includes factual information that distinguishes some of the securities SSB purchased from those of an average reasonable investor. The Court must interpret the complaint in favor of the plaintiff, but "a plaintiff can . . . plead himself out of a claim by including unnecessary details contrary to his claim." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). The 6690 Complaint states that two of the securities SSB purchased[8] were downgraded below investment grade by the

---

[7]      The Court recognizes that this ruling is in tension with dicta from *Stichting*. 802 F. Supp. 2d at 1136 ("Other complaints and public press reports make clear that a reasonable investor would have been aware of problems with underwriting at Countrywide by early 2008."); *id.* at n.9 ("Without disputing the premise that plaintiff's firms sometimes file premature and poorly researched complaints, this is not such an edge case. First, reports of problems with underwriting at Countrywide were widely disseminated in the press, corroborated in government hearings and by the announcement of investigations, and bolstered further when several state Attorneys General filed suit. Second, the 2007 and 2008 complaints were voluminous documents which provided impressive detail and were further supported by confidential witness reports."). The mere fact that some plaintiffs were able to offer complaints that this Court later recognized as sufficient under Rule 12(b)(6) does not mean that a reasonable investor should have, as a matter of law.

[8]      All of the securities SSB purchased were particularly risky. As mentioned by Defendants, the FDIC repeatedly advised, warned, criticized and ultimately restricted many of SSB's investments. 6690 RJN Ex. 1 9–12 (Office of the Inspector General, FDIC, Material Loss Review of Security Savings Bank, Henderson, Nevada, Sept. 2009). That fact is not legally

credit rating agency Fitch on December 13, 2007, more than one year before the FDIC became receiver of SSB.  6690 Complaint ¶ 25, Schedule 1 Item 25(f), Schedule 2 Item 25(f).  This Court has rejected the proposition that it is appropriate to delay the commencement of the limitations period until after the certificates were downgraded by the rating agencies below investment levels.  *Strategic Capital Bank*, 2012 WL 5900973, at *7.  The Court has never ruled on the opposite question, whether the statute of limitations begins to run once the certificates were downgraded by the credit rating agencies.

In this case, the date the federal claims accrued for CWALT 2006-29T1 B-1 and CWALT 2006-26CB B-2 occurred before February 27, 2008, because those certificates were downgraded below investment level on December 13, 2007. Plaintiffs like SSB had sufficient information from the filings of the *Luther*, securities and derivative complaints, the media sources about the problems in the mortgage origination market and Countrywide and the decline in the credit ratings to offer a well-pled complaint that the Offering Documents for those securities contained misstatements.  *Woori Bank v. Merrill Lynch*, No. 12 Civ. 3993(VM), 2013 WL 449912, at *4 (S.D.N.Y. Feb. 6, 2013) (a decline in credit ratings, along with media and other information, "began to expose the allegedly 'corrupt system'" of defendants for purposes of the statute of limitation, quoting the plaintiff's complaint); *In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, Master File No. 09 Civ. 2137(LTS)(MHD), 2010 WL 3239430 (S.D.N.Y. Aug. 17, 2010) (applying inquiry notice to hold that a "body of information" including ratings downgrades and the filing of similar lawsuits "makes it plain that inquiry notice arose well before May 2008."); *cf. In re Bear Stearns Mortg. Pass-*

---

relevant in assessing the commencement of the statute of limitations on a motion to dismiss, but may be critical for another motion to dismiss in this case or at summary judgment.  Investors like SSB, who invest in particularly risky securities, may face more responsibilities to ensure their investments are appropriate and reliable.

*Through Certificates Litig.*, 851 F. Supp. 2d 746, 764–65 ("absent a decline in the Certificates' ratings . . . it is difficult to see how a plaintiff could have plausibly pled that the epidemic of indiscretions in the MBS industry had infected his or her Certificates); *Fed. Hous. Fin. Agency v. UBS Ams.*, 858 F. Supp. 2d 306, 321 (S.D.N.Y. 2012) ("The downgrade of the securities' credit ratings . . . are crucial to [plaintiff's claim], since they are the only facts that connect the originators' general practices to particular securities that [the plaintiff] bought from defendants."); *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762, 773–74 (1st Cir. 2011) (supporting allegations behind a well-pled complaint include a "sharp drop in the credit ratings"). In another matter in this MDL, the FDIC specifically argued "that it is at least a question of fact whether the statute of limitations can begin to run on claims about a mortgage-backed security that still holds an investment grade rating." Mem. in Opp. to Defs.' Mot. to Dismiss Am. Compl. 19, *Fed. Deposit Ins. Corp. as Receiver for Strategic Capital Bank v. Countrywide Fin. Corp.*, 12-CV-4354, ECF No. 49 (Sept. 21, 2012).

In *Strategic Capital Bank*, this Court warned of a parade of horribles that would result if courts entirely delegated the determination of accrual dates to the credit rating agencies. 2012 WL 5900973, at *7. Those concerns are not relevant here. The Court rules that when combined with the type of information available here about an investment, a claim accrues soon after the downgrade of a security below investment levels. Before that date, investors must act reasonably to determine whether the offering documents related to their certificates contained misstatements. As numerous courts have recognized, credit rating downgrades give specific information about the documents behind a security. Reasonable investors, armed with information about downgrades, media sources of problems in underwriting, and other lawsuits, could craft a particularly well-pled complaint that states the offering documents contained misrepresentations, because they have

both general information about problems with the originator of their loans and specific information about the securities they purchased.

The Section 13 statute of limitations had expired before February 27, 2009, when the FDIC became receiver. The Section 11 and 12(a)(2) claims on those securities are time-barred unless the statute of limitations was tolled on another ground.

The Section 11 claims based on each security, except CWALT 2006-21CB B-2, are time-barred, as are both 12(a)(2) claims, because of the statutes of repose and limitations of Section 13. On February 27, 2009, Section 11 claims for CWALT 2006-21CB B-2 were still timely. The registration statement for that certificate was filed with the SEC on March 6, 2006. 6690 Complaint ¶ 25, Schedule 3 Item 27(h). The Court cannot hold as a matter of law that a reasonable investor had enough information to file an adequate complaint under Rule 12(b)(6) alleging misstatements in that certificate's Offering Documents before February 27, 2008. The three-year statute of repose for that certificate commenced, at the earliest, on March 6, 2006, and the one-year statute of limitations began after February 27, 2008. Section 11 claims based on CWALT 2006-21CB B-2 were therefore timely on February 27, 2009. The FDIC had at least three years from that date to bring its claims. 12 U.S.C. § 1821(d)(14). Therefore, the Section 11 claim was timely when filed on February 24, 2012.

Claims based on the other certificates in this case, CWALT 2006-29T1 B-1, CWALT 2006-26CB B-2, CWALT 2005-74T1 B-2, CWALT 2005-19CB B-2 and CWALT 2005-83CB B-2, were time-barred on February 27, 2009, and are time-barred now unless the statutes of limitations and repose were extended for some other reason.

### III.    There is no Basis to Toll the Statute of Limitations for the Federal Securities Claims

Both Complaints assert that the claims are timely for another reason, based upon a class action complaint filed in California state court on November 14, 2007. 6690 Complaint ¶¶ 108-109; 6692 Complaint ¶¶ 149-150 (both citing to the filing of the *Luther* Complaint).  The FDIC argues that the statute of limitations and repose were "tolled" by the filing of *Luther*.  *See Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 544 (1974) ("The commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action.").  The *Luther* Complaint was brought on behalf of "all persons or entities" that purchased CWALT certificates "pursuant and/or traceable to false and misleading registration statements issued by CWALT between January 2005 and June 2007."  *Luther* Complaint ¶ 1.  Therefore, as an asserted member of the class, the filing of *Luther* suspends the Section 13 statute of limitations as to their claims.

The Court rejects this argument.  SSB did not purchase certificates in the same tranche or even the same offering as David H. Luther, the named plaintiff in the earlier class action.  6690 RJN Ex. 8 (Certification of Named Plaintiff Pursuant to Federal Securities Laws filed in *Maine State Ret. Sys. v. Countrywide Fin. Corp.*, 10-CV-00302 (C.D. Cal.)); 6690 RJN Ex. 9 (Second Am. Class Action Compl. in *Maine State*).  "*American Pipe* tolling applies only to Countrywide MBS for which the named plaintiffs in the prior putative class actions had standing to sue, *i.e.*, those tranches that the *Luther* named plaintiffs had actually purchased." *Strategic Capital Bank*, 2012 WL 5900973, at *8.  Therefore, *American Pipe* is inapplicable, and the claims remain time-barred.

The Court will not reconsider its prior orders on the relation of tolling to standing or the definition of class standing.  When a class action plaintiff lacks standing with respect to certain claims, jurisdiction does not attach for those

1   claims, meaning that federal courts have no power to extend the statutorily defined

2   limitation periods.  *Strategic Capital Bank*, 2012 WL 5900973, at *9; *Palmer v.*

3   *Stassinos*, 236 F.R.D. 460, 465 n.6 (N.D. Cal. 2006).

4        The Court again rejects the reasoning of the Second Circuit's recent decision

5   on class standing.  *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,

6   693 F.3d 145 (2d Cir. 2012).  That decision is inconsistent with Supreme Court

7   precedent.  *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352–53 (2006) ("[A]

8   plaintiff must demonstrate standing for each claim he seeks to press.").  *NECA-*

9   *IBEW* is inconsistent with Ninth Circuit precedent.  *LaDuke v. Nelson*, 762 F.2d

10  1318, 1325 (9th Cir. 1985) ("certification is not sufficient in itself to bestow

11  standing on individuals or a class who lacked the requisite personal stake at the

12  outset."); *see also Lierboe v. State Farm Mut. Auto. Ins. Co.*, 350 F.3d 1018, 1022

13  (9th Cir. 2003) ("if [named plaintiff] has no ... claim, she cannot represent others

14  who may have such a claim").  The decision is inconsistent with the prior rulings[9]

15  of every federal court to consider similar questions in the RMBS context, including

16  the First Circuit Court of Appeal and numerous district courts, both in and outside

17  the Second Circuit.  Those courts extend standing only to the offerings or tranches

18  purchased by the named plaintiff.  *Nomura*, 632 F.3d at 770 ("Although Nomura

19  Asset is a common defendant with respect to all eight of the trusts, claims against it

20  as well fail so far as they are based on the six trusts whose certificates were

21  purchased by no named plaintiff; *In re Wash. Mut. Mortg.-Backed Sec. Litig.*, 276

22  F.R.D. 658, 663 (W.D. Wash. 2011); *Emps.' Ret. Sys. of the Gov't. of the Virgin*

23  *Islands v. J.P. Morgan Chase & Co.*, 804 F. Supp. 2d 141, 150 (S.D.N.Y. 2011)

24  ("courts have almost unanimously found that claims under Section 11 or Section

25  12 require plaintiff to have purchased in each of the challenged offerings."); *In*

26

27  [9]    Recently, another court outside the Second Circuit rejected *NECA-IBEW*.  *Nat'l Credit*

28  *Union Admin. Bd., as Liquidating Agent of U.S. Cent. Fed. Credit Union & of W. Corp. Fed.*
*Credit Union v. Goldman Sachs & Co.*, at *6, 11-CV-6521-GW (C.D. Cal. Mar. 14, 2013).

*Wells Fargo Mortg.-Backed Certificates Litig.*, 712 F. Supp. 2d 958, 963–65 (N.D. Cal. 2010); *Strategic Capital Bank*, 2012 WL 5900973, at *12 (citing a prior filing collecting more cases). A district court in the Second Circuit recently limited class standing, in a related legal claim, to "the five Trusts in which [Plaintiff] purchased certificates," because "each Trust has a unique loan composition (and is administered under a unique [even if similar] PSA.)" *Policemen's Annuity and Benefit Fund of City of Chicago v. Bank of Am., N.A.*, No. 12 Civ. 2865(KBF), 2012 WL 6062544, at *7 (S.D.N.Y. Dec. 7, 2012). Finally, the policy implications of the Second Circuit's rule remain worrisome. It would enable plaintiffs to expand a small securities purchase into an enormous and unwieldy class action that under *American Pipe*, would toll the statute of limitations as to all securities with any common mortgage originator, even if the originator created only a small portion of the loans at issue. For these reasons, the Court again rejects the reasoning of *NECA-IBEW*.[10]

The Court also takes this opportunity to offer additional thoughts about its alternative ruling in *Strategic Capital Bank*. The Court there held that a class action filed in state court does not toll the statute of limitations for subsequent individual federal actions even when both are based on the same federal substantive law. 2012 WL 5900973, at *12. First, another important precedent supports that conclusion. Second, the rule is particularly appropriate with respect to class actions based on the Securities Act, and conforms closely with the purposes of the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Third, court decisions rejecting "cross-jurisdictional tolling" do so regardless of whether the initial class action was based upon the same substantive law as the

---

[10] The Court mentioned in *Strategic Capital Bank* that the defendants in *NECA-IBEW* had sought Supreme Court review of the decision. After the submission of briefing in this case, the Supreme Court denied certiorari. *See* http://www.supremecourt.gov/Search.aspx?FileName=/docketfiles/12-528.htm.

1  subsequent individual action.  These three grounds provide further support for the

2  proposition that *American Pipe* tolling only extends statutes of limitation when the

3  class action was filed in federal court.

4  The alternative holding of *Strategic Capital Bank* follows directly from a

5  decision by the Seventh Circuit.  *See Walters v. Edgar*, 163 F.3d 430, 432 (7th Cir.

6  1998).  In that case, Judge Posner held that when "plaintiffs never had standing to

7  bring this suit . . . federal jurisdiction never attached."  *Id.*  District courts,

8  including this one, have cited *Walters* for the proposition that a class action only

9  tolls the statute of limitation for a claim when the named plaintiff had Article III

10  standing with respect to that claim.  *Strategic Capital Bank*, 2012 WL 5900973, at

11  *9; *Stassinos*, 236 F.R.D. at 465.  Judge Posner's reasoning, though, should not be

12  limited to cases where plaintiffs did not have standing, because Article III standing

13  is just one part of the jurisdictional inquiry.  FED. R. CIV. P. 12(b)(1); *In re Century*

14  *Aluminum Co. Secs. Litig.*, 704 F.3d 1119, 1123 (9th Cir. 2013) ("Dismissal for

15  lack of subject matter jurisdiction would have been appropriate if plaintiffs had not

16  adequately alleged Article III standing.").  *Walters* applies whenever federal

17  jurisdiction does not attach to the class action, including the situation where the

18  case was filed and remains in state court pending resolution of a jurisdictional

19  dispute.[11]

20  The *Luther* Complaint remained in state court until June 12, 2012, almost

21  five years after filing.  There was no basis to remove the case until May 14, 2012.

22  Amended Order Re: Plaintiffs' Motion to Remand, *Luther v. Countrywide Fin.*

23  *Corp.*, 12-CV-5125, ECF No. 74 (C.D. Cal. Sept. 4, 2012).[12]  Before that date,

24  federal jurisdiction did not attach to the class action.  Without federal jurisdiction,

25

26  [11]    The Seventh Circuit has applied *American Pipe* to state court class actions, but the court did not discuss *Walters*.  *Sawyer v. Atlas Heating*, 642 F.3d 560 (7th Cir. 2011).

27  [12]    The class action was improperly removed and remanded to the state court by this Court in 2008, in a decision affirmed by the Ninth Circuit.  *See Luther v. Countrywide Home Loans*

28  *Serv. LP*, 533 F.3d 1031 (9th Cir. 2008).

"it would be beyond the constitutional power of a federal court to toll a period of limitations based on a claim" because the case was not before the federal court. *Stassinos*, 236 F.R.D. at 465 n.6.

Second, the fact that *Luther* was filed under the Securities Act strengthens this conclusion.  The PSLRA creates additional requirements for class actions filed in federal court, including the provision of certain information by plaintiffs.  Those requirements do not apply in state court.  As a result, defendants in a state court class action lack some of the "essential information" necessary to give them proper notice, and *American Pipe* cannot apply.  414 U.S. at 555.  Extending *American Pipe* tolling to state court class actions is also inconsistent with Congress' stated purposes in passing the PSLRA.

The PSLRA was passed in 1995 to eliminate "abusive practices in securities litigation."  Senate Report No. 104–98, 104th Congress, reprinted in 1995 U.S.C.C.A.N. 679, 689 (abusive practices included "the use of professional plaintiffs and the race to the courthouse to be the first to file the complaint," and noting that many of the reforms in the PSLRA were designed to "deter professional plaintiffs").  One subsection of the PSLRA required any plaintiff "seeking to serve as a representative party on behalf of a class" to provide a "sworn certification" that, in part, "sets forth all of the transactions of the plaintiff in the security that is the subject of the complaint during the class period specified in the complaint."  15 U.S.C. § 77z–1(a)(2)(A)(iv).  Congress required this certification "to further deter professional plaintiffs" from filing abusive litigation.  Senate Report No. 104–98, 1995 U.S.C.C.A.N. at 689; *Greebel v. FTP Software, Inc.*, 939 F. Supp. 57, 58 (D. Mass. 1996) (Congress attempted to reduce "frivolous suits on behalf of only nominally interested plaintiffs in the hope of obtaining a quick settlement.").

The certification is a critical part of securities class actions in federal court.  "The failure of a named plaintiff to file a certification with the complaint . . . [is] fatal to the maintenance of the putative class action."  *In re USEC Secs. Litig.*, 168

F. Supp. 2d 560, 566 (S.D.N.Y. 2001).[13]  Further, "a plaintiff lacks standing under both Article III of the U.S. Constitution and under Sections 11 and 12(a)(2) of the 1933 Act to represent the interests of investors in MBS offerings in which the plaintiffs did not themselves buy."  *Me. State Ret. Sys. v. Countrywide Fin. Corp.*, 722 F. Supp. 2d 1157, 1163 (C.D. Cal. 2010).  In most cases, the only way to determine which securities the named plaintiff purchased is through the filing of the certification with the plaintiff's complaint.  *See, e.g.,* 6690 RJN Ex. 8 (Certification of Named Plaintiff Pursuant to Federal Securities Laws filed in *Maine State Ret. Sys. v. Countrywide Fin. Corp.*, 10-CV-00302 (C.D. Cal.)); Decl. of David A. Rosenfeld in Support of Mot. to Appoint Counsel, Ex. A, ECF No. 5, *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 1:08-CV-10783-MGC (S.D.N.Y. Feb. 9, 2009) ("Certification of Named Plaintiff Pursuant to Federal Securities Laws").[14]  Finally, statements in a certification are a "judicial admission."  *Grimes v. Navigant*, 185 F. Supp. 2d 906, 914 (N.D. Ill. 2002).  Judicial admissions can determine the "scope of a plaintiff's asserted class for tolling purposes."  *Smith v. Pennington*, 352 F.3d 884, 893 (4th Cir. 2003) ("We are not, however, confined to examine *only* the complaint in determining the scope of the class [plaintiff] sought to certify.  The scope of a plaintiff's asserted class for tolling purposes is that class for which there was fair notice as to . . . the number and generic identities of the potential plaintiffs that might participate in the

---

[13]   Federal courts have generally been lenient in granting leave to amend the complaint to include this certification, but there is no question that the filing of the certifications is "important in its own right."  *In re Direxion Shares ETF Trust*, No. 09 Civ. 8011(KBF), 2012 WL 717967, at *6 (S.D.N.Y. Mar. 6, 2012).

[14]   The Court would note that even under *NECA-IBEW*, class standing is dependent on the securities that the named plaintiff purchased, because that plaintiff can only represent certificate-holders from the offerings backed by loans with common originators.  *NECA-IBEW*, 693 F.3d at 164.

judgment if the plaintiff's desired class was, in fact, certified.") (citations omitted).[15]

Because failure to provide the certification is fatal to a plaintiff's claim, the certification informs the defendants of the named plaintiff's standing, and statements in the certification are judicial admissions which may determine the scope of plaintiff's class definition, the Court considers the certification "essential information." If the initial class action fails to notify the defendants of "essential information necessary to determine both the subject matter and size of the prospective litigation" then *American Pipe* tolling does not apply. *In re Direxion Shares ETF Trust*, 279 F.R.D. 221, 237 (S.D.N.Y. 2012) (discussing "*American Pipe's* requirement that defendants be apprised 'of the essential information'" before the prior class action has the power to toll the statute of limitations for later individual claims); *Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345, 354–55 (1983) (Powell, J., concurring) ("When thus notified [of the essential information], the defendant normally is not prejudiced by tolling of the statute of limitations.").

There is no obligation for the named plaintiff in a state court class action to certify the securities transactions that are the subject of the litigation.[16] 15 U.S.C. § 77z-1(a)(1) ("The provisions of this subsection shall apply to each private action arising under this subchapter that is brought as a plaintiff class action pursuant to the Federal Rules of Civil Procedure."). A class action in state court, filed without the certification,[17] does not give defendants the "essential information to determine

---

[15]     *Smith* is factually distinct, since the Fourth Circuit interpreted plaintiff's filings as limiting the asserted class. Nonetheless, *Smith* makes clear that courts can rely on judicial admissions, which include the certification from the named plaintiff, for purposes of determining the scope of the class under Rule 23.

[16]     The Court is not aware of any California statute requiring that such information be filed in a class action.

[17]     Indeed, the plaintiffs in the *Luther* action never filed such a certification in state court. The certification was only filed when those plaintiffs brought the *Maine State* case, 10-CV-00302 (C.D. Cal.) in federal court.

both the subject matter and size of the prospective litigation," and therefore cannot trigger *American Pipe* tolling.  414 U.S. at 555–56.

The Congressional purposes as expressed in the PSLRA and the Federal Rules, are best served by refusing to extend *American Pipe* tolling to state court actions.  The PSLRA was designed to reduce abusive filings.  Senate Report No. 104–98, 104th Congress, reprinted in 1995 U.S.C.C.A.N. at 689.   Filings in state court are not subject to any of the reforms in that legislation, and so are more likely to permit such abuse.  These class actions also do not need to meet the basic requirements of Rule 23 of the Federal Rules.  *Strategic Capital Bank*, 2012 WL 5900973, at *13.  Extending *American Pipe* tolling only to federal claims would incentivize the filing of securities class actions in the federal courts, which can then use the PSLRA and Rule 23 to deal fairly and efficiently with tese claims.  Reducing such filings was Congress' purpose in passing the PSLRA.  *See also Merrill Lynch v. Dabit*, 547 U.S. 71, 82 (2006) (describing the Securities Litigation Uniform Standards Act, a federal law designed to force securities claims to be filed in federal courts, seeking to "stem this shift from Federal to State courts" and "prevent certain State private securities class action lawsuits alleging fraud from being used to frustrate the objectives of the Reform Act.").

The FDIC criticizes this discussion as hypothetical.  Mem. of P. & A. of FDIC's Opp. to Defs.' Motion to Dismiss 21 ("6690 Opp.,") 12-CV-6690, ECF No. 99.  Hypothesizing is unnecessary – the class action complaint in *Luther* was "precisely [a] type of abusive placeholder lawsuit."  *Putnam Bank v. Countrywide Fin. Corp.*, 860 F. Supp. 2d 1062, 1070 (C.D. Cal. 2012).  This abusive class action remained in state court for years, whereas the Federal Rules and PSLRA requirements might have led to a swifter resolution, and an end to the tolling period.  *Cf. Walters*, 163 F.3d at 433 (urging "scrupulous adherence to the requirement that the determination whether to certify a suit as a class action be

1    made 'as soon as practicable after the commencement of the action.' FED. R. CIV.

2    P. 23(C)(1).").

3          Finally, state court decisions discussing "cross-jurisdictional tolling" are

4    instructive about the nature of such tolling. State courts have considered when a

5    class action filed in another jurisdiction extends the state statute of limitations for a

6    subsequent individual claim. In some of the cases rejecting cross-jurisdictional

7    tolling, the original class action was based upon the same substantive law as the

8    subsequent individual action. *Maestas v. Sofamor Danek Grp., Inc.*, 33 S.W.3d

9    805 (Tenn. 2000) (both the class action, which was filed in federal court, and the

10   individual action, filed in state court, were brought for products liability claims).

11   In *Maestas*, the Tennessee Supreme Court rejected tolling because it believed that

12   cross-jurisdictional tolling ran the risk of turning Tennessee state courts into a

13   clearinghouse for filings that should have been brought in another jurisdiction. *Id.*

14   at 808. *Maestas* is clear that when interpreting the tolling effect of a foreign class

15   action based on the forum state's substantive law, forum courts should look to

16   whether the class action was filed in consonance with the forum state's procedural

17   rules.[18] *See also Vaccariello v. Smith & Nephew Richards, Inc.*, 763 N.E.2d 160,

18   162–63 (Ohio 2002) (accepting cross-jurisdictional tolling because of procedural

19   concerns, namely that "the bulk of Ohio's class action rule . . . is identical to the

20   bulk of the federal class action rule. This congruity convinces us that a class action

21   filed in federal court serves the same purpose as a class action filed in Ohio . . . it is

22   more important to ensure efficiency and economy of litigation than to rigidly

23   adhere to" a prior decision);[19] *contra Sawyer*, 642 F.3d 560, 562–63 (7th Cir.

24

25   [18]   Otherwise, the federal courts would grant to state courts "the power to decide when [the

26   federal] statute of limitations begins to run. Such an outcome is contrary to [Congress'] power to adopt statutes of limitation and the exceptions to those statutes." *Maestas*, 33 S.W.3d at 808.

27   [19]   This Court rejects, as it did in *Strategic Capital Bank*, the assertion that a class action filed in state court serves the same purpose as a federal court class action. Separately,

28   *Vaccariello* provides further support for the prior discussion of the PSLRA. "Whether a class

2011) ("Federal law determines the tolling effect of a suit governed by a federal statute of limitations. *American Pipe* establishes that federal rule."); *City Select Auto Sales, Inc. v. David Randall Associates, Inc.*, No. 11–2658 (JBS/KMW), 2012 WL 426267, at *3 n.2 (D.N.J. Feb. 7, 2012) ("Defendant does not contend, and it does not appear to the Court that the fact that the prior class action suit was filed in state court is relevant to the application of American Pipe. No rule or policy prohibits cross-jurisdictional tolling," citing *Sawyer*). In the posture of this case, a federal court must look to its own procedural rules, the Federal Rules of Civil Procedure, to determine the scope of tolling. Because the state court action was not filed in conformance with the Federal Rules of Civil Procedure, which is the basis for *American Pipe* tolling, the class action cannot toll the statute of limitations for individual federal actions. *Strategic Capital Bank*, 2012 WL 5900973, at *13.

This Court's alternative ruling in *Strategic Capital Bank* was carefully considered. Federal case law supports the ruling. The rule is particularly resonant with respect to class actions based on the Securities Act. Finally, state court rulings on cross-jurisdictional tolling demonstrate that such tolling is based on procedural rules, not the identity of the substantive law between the two actions. In summary, only a class action filed in federal court tolls the federal statute of limitations for later complaints. *American Pipe* tolling does not save the FDIC's claims.

## IV.   *The Statute of Limitations in the Nevada Securities Act had not Expired on February 27, 2009*

action is filed in Ohio or the federal court system, the defendant is put on notice of the substance and nature of the claims against it." 763 N.E.2d at 163. As mentioned, a state court securities class action does not give proper notice to defendants of the substance or nature of the claims of the class.

1    The FDIC brings claims under the Nevada Securities Act, Section 90.570,

2    against Banc of America Securities and Barclays for their roles in selling and

3    underwriting CWALT 2006-29T1 B-1 and CWALT 2006-26CB B-2.  Those

4    claims must be "brought within the earlier of 2 years after discovery of the

5    violation, 2 years after discovery should have been made by the exercise of

6    reasonable care, or 5 years after the act, omission or transaction constituting the

7    violation."  Nevada Revised Statutes § 90.670.

8    SSB could not have discovered the misstatements before February 27, 2007.

9    "[R]easonable investors cannot, as a matter of law, be held to have discovered

10   misstatements until after August 31, 2007."  *Fed. Deposit Ins. Corp. as Receiver*

11   *for United W. Bank v. Countrywide Fin. Corp.*, 11-CV-10400, 2013 WL 49727, at

12   *1 (C.D. Cal. Jan. 3, 2013) (citing cases from this Court).  Even in situations where

13   the filed complaints rely heavily on automated valuation models that certainly

14   could have been used as early as February 2007 to discover the misstatements, the

15   Court cannot hold as a matter of law that a reasonable investor would have realized

16   the need for such analysis, and that the "data would have led a reasonable investor

17   both to recognize the misstatements and to link those to the possibility that the

18   securities purchased by [plaintiff] would suffer losses."  *Id.*[20]  SSB also purchased

19

20   _____

     [20]    The 6690 Defendants focus their briefing on whether Nevada has a stringent discovery

21   rule that commences the limitation period when the plaintiff has "access to facts" necessary to

     bring their claim.  *Momot v. Mastro*, No. 2:09–cv–00975–RLH–LRL, 2011 WL 1362096 (D.

22   Nev. Apr. 11, 2011); *Baroi v. Platinum Condo. Dev. LLC*, No. 2:09–CV–00671–PMP, 2012 WL

     2847819 (D. Nev. July 11, 2012).  This version of the rule seems at odds with the very cases

23   Defendants cite.  *Mastro*, 2011 WL 1362096, at *3 (holding that the statute of limitations

     commences once the plaintiff had "the only fact that [he] needed in order to bring suit for failure

24   to register"; in other words, that rule is very similar to the *Merck* discovery rule).  The Court

     interprets Nevada's discovery rule as identical to the federal discovery rule, commencing when

25   plaintiff has facts to plead a complaint sufficient to survive a motion to dismiss.  The Nevada

     Securities Act "is based upon federal securities acts," so when the two have similar language,

26   Nevada courts will look to federal case law interpreting the parallel provision.  *State v. Friend*,

     40 P.3d 436, 439–40 (Nev. 2002).  When the language in a Nevada statute differs from federal

27   law, though, courts must assume "the difference was deliberate."  *Baroi*, 2012 WL 4606720, at

28

1   CWALT 2006-29T1 B-1 and CWALT 2006-26CB B-2 within five years of
2   February 27, 2009.  The statute of repose in the Nevada Securities Act Section
3   90.670 is extended by Section 1821, *see supra*.  Because the Nevada Securities Act
4   claims based on those securities were live on February 27, 2009, they were timely
5   filed when the FDIC sued Barclays and Banc of America Securities on February
6   24, 2012.

7   **V.      The Nevada Securities Act Claim Against Barclays is Dismissed for Lack**
8   **of Personal Jurisdiction**

9        Once a federal claim is dismissed, the law "no longer provide[s] a basis for
10  asserting . . . personal jurisdiction over [a defendant] for the state law claims."
11  *Malone v. Clark Nuber, P.S.*, No. C07–2046RSL, 2008 WL 4279502, at *2 (W.D.
12  Wash. Sept. 12, 2008).  The Court dismissed the Securities Act claim against
13  Barclays.  Therefore, the Court must consider whether personal jurisdiction is
14  appropriate for the Nevada Securities Act claim against Barclays.

15       The Court applies the personal jurisdiction law of Nevada "[b]ecause the
16  case was transferred from [that state]," so "the Court may exercise jurisdiction only
17  to the same extent that the [Nevada] district could have done so."  *Mass. Mut.*,
18  2012 WL 1322884, at *7.  Nevada's long-arm statute "permits personal
19  jurisdiction over a nonresident defendant unless the exercise of jurisdiction would
20  violate due process."  *Consipio Holding, BV v. Carlberg*, 282 P.3d 751, 754 (Nev.
21  2012).  Barclays is subject to Nevada courts, then, if Nevada has specific
22  jurisdiction, meaning this claim is related to Barclays' contacts with Nevada, or
23  general jurisdiction, if Barclays has "continuous and systematic general business
24

25  *4 (citing *Lane v. Allstate Ins. Co.*, 969 P.2d 938, 940 (Nev. 1998)).  The relevant term,
26  "discovery," is found in the Nevada Securities Act, Section 13 and the Supreme Court's decision
    in *Merck*.  Therefore, the Court will interpret the Nevada statute of limitations in conformance
27  with its interpretation of federal law.  The Court cannot rule as a matter of law that SSB could
    have filed a well-pled complaint before February 27, 2007, or even, as mentioned earlier,
28  February 27, 2008.

contacts" with the state.  *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 108, 414, 416 (1984).

The Ninth Circuit employs a "three-part test to determine if a defendant has sufficient minimum contacts to be subject to specific personal jurisdiction: (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, *i.e.* it must be reasonable."  *Washington Shoe Co. v. A-Z Sporting Goods Inc.*, 704 F.3d 668, 672 (9th Cir. 2012).  The FDIC "must satisfy the first two prongs.  If it does so, then [Barclays] must come forward with a compelling case that the exercise of jurisdiction would not be reasonable." *Id.* (citations omitted).  The first prong is met if the FDIC shows that Barclays purposefully directed its activities to Nevada, under the Ninth Circuit's "effects" test, or that Barclays purposefully availed itself of the privilege of conducting activities or consummated a transaction in Nevada. *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1206 (9th Cir. 2006).

The only fact the FDIC cites to in support of this prong in its briefing or complaint is that Barclays participated in creating the Offering Documents, including the prospectus supplement at issue,[21] with the intention that it be read and relied upon by Nevada investors who would purchase some of the certificates

---

[21]     Barclays argues, convincingly, that this allegation is contradicted by the Offering Documents upon which the FDIC relies, because those documents make clear that Barclays underwrote the Class A certificates, not the riskier securities SSB bought.  6690 RJN Ex. 64 (prospectus supplement for CWALT 2006-29T1 B-1) ("Barclays Capital Inc. will offer the Class A Certificates").  The FDIC's claim would be dismissed even if Barclays had underwritten the certificates SSB purchased.

underwritten by Barclays.  6690 Complaint ¶¶ 4, 7, 113, 130.  The Complaint specifies that Barclays was "an underwriter of the certificate that Banc of America Securities sold to SSB in Securitization 1.  The sale of this certificate occurred in Nevada because employees or agents of Banc of America Securities directed communications about the certificates and solicitations to purchase the certificates to SSB there, and because SSB received those communications and solicitations there."  *Id.* ¶ 113.  "Barclays . . . offer[ed] or s[old] securities in Nevada by means of written communications that included untrue statements of material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."  *Id.* ¶ 114.

This fact is insufficient under either the "purposeful availment" or "purposeful direction" tests.[22]  The 6690 Complaint includes no facts suggesting that Barclays acted in Nevada in creating the prospectus supplement, that Barclays targeted SSB there or that Barclays consummated any contract with SSB in Nevada.  *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004) ("A showing that a defendant purposefully availed himself of the privilege of doing business in a forum state typically consists of evidence of the defendant's actions in the forum, such as executing or performing a contract there.").  When plaintiffs complain of actions of defendants that occurred outside the forum state, but led to injury in the state, the Ninth Circuit looks to the "effects" test, which allows jurisdiction when "the defendant allegedly [has] (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the

---

[22]    The Ninth Circuit applies the tests based on whether the legal pleading is based on tort or contract principles.  *Yahoo! Inc.*, 433 F.3d at 1206.  The Nevada Securities Act is not easily characterized as one or the other.  *FHFA*, 2012 WL 5275327, at *9 (discussing the characterization problem for Section 11).  The 6690 Defendants spend nearly three pages of briefing discussing the related question of whether these claims are based on fraud.  Because the FDIC's complaint fails to meet either test, the Court need not resolve whether the claim is for tort or contract.

defendant knows is likely to be suffered in the forum state." *Id.* at 803 (citations omitted).  The FDIC offers no facts, nor any allegations, to support its proposition that Barclays aimed its activities at Nevada,[23] or that Barclays knew the securities would be sold in Nevada.  Instead, all the 6690 Complaint alleges is that Barclays underwrote one certificate that Banc of America Securities sold to SSB.  This Court has held in a related factual situation that signing a registration statement, by itself, does not constitute purposeful direction, especially because the certificates "were registered with the SEC and disseminated nationally (and internationally)." *W. & S. Life Ins. Co. v. Countrywide Fin. Corp.*, No. 11-CV-7166, 2012 WL 1097244, at **13–14 (C.D. Cal. Mar. 9, 2012).[24]  The Complaint fails to allege that Barclays intended its representations to affect parties in Nevada, which means that Nevada does not have specific jurisdiction over this claim.[25]

The FDIC argues that there is a "sufficiently strong" "possibility" that Barclays may be subject to general personal jurisdiction in Nevada.  6690 Opp. 24. Plaintiff asks for limited jurisdictional discovery on this point.  The Court refuses

---

[23]     The first time the FDIC claims Barclays acted "with the intention that [the prospectus supplement] be circulated into Nevada and read and relied upon by Nevada investors so they would then purchase certificates underwritten by Barclays," 6690 Opp. 23, was in the FDIC's Opposition.  The Court will not consider that allegation for purposes of this motion.  *Schneider v. Cal. Dep't of Corrections*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998) ("The 'new' allegations contained in the [plaintiff's] opposition motion, however, are irrelevant for Rule 12(b)(6) purposes. In determining the propriety of a Rule 12(b)(6) dismissal, a court may not look beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss.").

[24]     *See also United Heritage Life Ins. Co. v. First Matrix Invs. Servs. Corp.*, No. CV 06-0496-S-MHW, 2007 WL 1792333 at *7 (D. Idaho June 20, 2007) ("underwriter status alone is not enough to allow for the assertion of personal jurisdiction.").

[25]     The FDIC misrepresents the holding of the only case it cites to the contrary. *Schwarzenegger*, 374 F.3d at 803.  There, the Ninth Circuit rejected the claim for jurisdiction, making clear that personal jurisdiction is only appropriate when the defendant "published" and "circulated," "distributed," "delivers" or "shipped" products or goods into the forum state.  374 F.3d at 803 (citing and discussing previous Supreme Court and Ninth Circuit decisions).  The FDIC does not allege that Barclays performed any such act in or at Nevada, and therefore Nevada cannot exercise personal jurisdiction over Barclays.

to grant that discovery, because it is based on "little more than a hunch that it might yield jurisdictionally relevant facts." *Boschetto v. Hansing*, 539 F.3d 1011, 1020 (9th Cir. 2008); *Butcher's Union Local No. 498 v. SDC Inv., Inc.*, 788 F.2d 535, 540–41 (9th Cir. 1986) (rejecting jurisdictional discovery, because plaintiffs "state only that they 'believe' that discovery will enable them to demonstrate sufficient" contacts, and "speculation does not satisfy" the required showing).

Therefore, because the 6690 Complaint pleads no facts that Barclays purposefully directed SSB in Nevada, purposefully availed itself of the privilege of conducting activities in Nevada or had continuous and systematic business contacts in the state, the Nevada state law claims against Barclays are dismissed for lack of personal jurisdiction.

### VI.    Conclusion

The federal law claims are all time-barred, except for the Section 11 claim based on CWALT 2006-21CB B-2.  No tolling doctrine saves those claims.  The FDIC's Nevada Securities Act claims are timely, and can proceed, but not against Barclays, because Nevada would not have personal jurisdiction over the bank.  All dismissals are with prejudice.


IT IS SO ORDERED.

DATED:  March 21, 2013

*Mariana R. Pfaelzer*

_____

Hon. Mariana R. Pfaelzer
United States District Judge